221 N.J. Super. 493 (1987)
535 A.2d 15
JAMES CULVER AND LORETTA CULVER, PLAINTIFFS-APPELLANTS,
v.
INSURANCE COMPANY OF NORTH AMERICA, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted November 10, 1987.
Decided December 1, 1987.
*495 Before Judges PRESSLER, MUIR, Jr. and CONLEY.
Michael F. Chazkel, attorney for appellants (Glenn A. Bergenfield, of counsel and on the brief).
Gennet and Kallmann, attorneys for respondent (Jory E. Miller, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Plaintiffs-insureds, who suffered an underinsured fire loss caused by the negligence of others, entered into an agreement with their casualty insurer respecting the division between them of the proceeds of the insurer's subrogation action against the tortfeasors. They claim that the agreement, procured by the insurer's fraud and misrepresentation, was unreasonable and inequitable. The question on appeal is whether, under the circumstances here, they are barred by any preclusionary doctrine from obtaining relief from that agreement and from an order enforcing it which was entered in the subrogation *496 action. We hold that they are not, and accordingly, we reverse the summary judgment which dismissed the complaint of plaintiffs James and Loretta Culver against their insurer, defendant Insurance Company of North America (INA).
The facts, as we are able to glean them from the regrettably sparse record, are as follows. In November 1981 plaintiffs' home was destroyed by a fire which was apparently caused by a malfunction in a gas stove manufactured by General Electric Company. They had purchased the stove shortly before the fire from Better Living Department Stores, Inc., which had also installed it. It is not clear whether there was a defect in the stove or in its installation or both. In any event, plaintiffs submitted a proof of loss to their fire insurance carrier, INA, making claim for damages in the amount of some $185,000. It appears that plaintiffs were underinsured. The limit of their coverage was $82,373.12, which INA paid plaintiffs, taking back from them an assignment of their rights against the two alleged tortfeasors. INA then commenced its subrogation action against both in plaintiffs' name. INA controlled that litigation in all respects although plaintiffs had their own counsel with whom they and INA appear to have consulted from time to time.
Insofar as we can determine from certifications filed both in that action and this one, the parties conducted "extensive discussions" relatively early on in the course of the subrogation litigation "to resolve how any settlement or judgment would be divided between the parties." As the certification of INA's attorney explains, following a meeting participated in by him, plaintiffs and plaintiffs' personal attorney, "a preliminary agreement was established whereby the insurance carrier would first be satisfied from any proceeds. INA would be responsible for all costs and expenses of the litigation, and the Culvers would receive a reduced attorney's fee of 25%." This agreement was thereafter modified just prior to trial of the subrogation action. The terms of the modification agreement *497 provided, astonishingly, that INA would receive 80% of the proceeds of the action and the insureds 20%. In his certification, INA's attorney explained the reason for this change as follows:
Subsequent to that date, problems with liability developed and it became apparent that the initial $82,373.12 paid by INA might never be reached. The Culvers could not be expected to agree to any settlement that would not pay them any money and as an accommodation substantial effort was made by myself and Steven Kropf to reach a new agreement that would split any recovery on a pro rata basis. The Culvers insisted that they bear no risk for litigation expenses in the event the case was lost and wanted to maintain minimal attorneys' fees on their portion of any recovery.
The issues of liability and damages in the subrogation action were bifurcated, and during the liability trial, INA reached a settlement with General Electric, releasing it for the sum of $25,000. That sum was forthwith disbursed to INA and plaintiffs in accordance with the 80/20 agreement. The liability verdict reached by the jury at the conclusion of trial assessed zero percent against General Electric. The matter was then set down for trial of the damages issue. On the trial date, INA negotiated a settlement with Better Living Department Store in the amount of $135,000 and obtained the consent of plaintiff Loretta Culver to its acceptance.[1] INA's attorney in fact called Mrs. Culver to the stand to state her understanding and agreement on the record. In a perfunctory proceeding consuming two pages of transcript, she was asked if she agreed to the settlement of $135,000 and if the arrangement she had reached with INA "how that money is to be divided between yourself and the insurance carrier" was satisfactory. She indicated her assent to both questions. The terms of the "arrangement" with INA, unlike the terms of the settlement with Better *498 Living, were not, however, placed on the record, and it does not appear that at that time the trial judge had any idea, nor did he inquire, as to what they were.
Some time after the February 1986 date of the settlement and plaintiff's record concurrence therein, INA's attorney apparently proffered plaintiff her share of the settlement proceeds. It appears that the proffer, predicated on the 80/20 agreement and calculated on the basis of the total settlement of $160,000 (which included General Electric's $25,000 payment), allocated $23,583.33 to plaintiffs, $92,000 to INA, and $44,416.67 for legal fees and costs. Realizing that by this calculation INA would receive from the proceeds of the settlement more than it had paid out to her on the policy coverage and that her total recovery, both by way of the policy limit and the settlement proceeds, would be substantially less than her loss, plaintiff refused to accept this disbursement proposal.
Consequently, in May 1986 INA's attorney moved the court for an order directing disbursement in accordance with the agreement, and plaintiff, now represented by her present attorney, responded by filing a cross-motion which also sought "an order permitting the disbursement of proceeds." Plaintiff's certification in support of this uninformatively and inexactly phrased claim for relief did not propose an alternative disbursement scheme. Rather, it merely asserted her resistance to INA's distributive proposal based on what she described as the "misinformation" given her both by INA's attorney and her own. In brief, it was her position that INA's attorney assured both her and her attorney that INA, as a matter of law, was entitled to reimbursement of the $82,373.12 it had paid her on the policy plus 12% interest before she would be entitled to any share in the proceeds of the subrogation suit. She further asserted that INA's attorney assured her that the net recovery in the subrogation action "could not be in excess of $82,373.12." She therefore agreed to accept 20% of the recovery, which she *499 claimed she was given to understand was her only alternative to receiving no portion of the recovery at all.
At the hearing on the motion and cross-motion for disbursement, the trial judge apparently understood plaintiff's claim to be a request to be relieved from the settlement agreement with Better Living with which she was thereafter dissatisfied. The transcript of the argument indicates to us that the trial judge failed entirely to distinguish, on the one hand, between the settlement agreement entered into between the tortfeasors and Mrs. Culver, as the nominal plaintiff, by which the subrogation action was terminated and, on the other hand, the agreement between plaintiff and INA respecting the disbursement of the settlement proceeds. Accordingly, the trial judge neither inquired into nor addressed plaintiff's assertions respecting her agreement with INA but rather considered only the settlement with the tortfeasors. Noting that "we can't relitigate cases," the trial judge refused to set that settlement aside, but no one was asking him to. Thereafter, INA's attorney submitted a form of order memorializing its earlier proffer. That order was entered on June 16, 1986.
Plaintiff did not appeal from the disbursement order, although it was clearly appealable. R. 2:2-3(a)(1). Nor did she file a motion pursuant to R. 4:50-1 for relief from that order, although that procedure too would have been an appropriate vehicle for placing before the court the nature and basis of her claim for relief from her allocation agreement with INA. Instead, on September 24, 1986, just three weeks after the running of the time to appeal as extendable, plaintiff filed the complaint in this action against INA. Alleging that her consent to the distributive agreement was obtained by INA in breach of its fiduciary obligation to her and by misrepresentation of both fact and law on which she relied, she sought compensatory and punitive damages, "just and equitable" settlement, attorney's fees, interest and costs. INA, relying on the June 16, 1986 order in the subrogation action, moved for summary judgment *500 dismissing the complaint on the ground of res judicata. The motion was granted. Plaintiff appeals. We reverse.
At the outset, we are persuaded that if plaintiff's version of the circumstances leading to and surrounding her 80/20 agreement with INA is credited, she would clearly be entitled to relief therefrom and consequently to relief from the June 16, 1986 order which enforced it. We are convinced that this conclusion is compelled by basic principles of subrogation law. Subrogation is, of course, an equitable remedy based upon the common-law concept that the burden for the ultimate discharge of an obligation ought to rest on the one who in good conscience ought to pay it. See Aetna Ins. Co. v. Gilchrist Brothers, Inc., 85 N.J. 550, 560 (1981), pointing out that the right of subrogation may exist by reason of agreement, statute, or as a matter of equity. It is, moreover, clear that as between insured and insurer, the insurer's subrogation rights ordinarily derive from agreement as set forth in the contract of insurance. Nevertheless, since "[s]ubrogation is an offspring of equity * * * its equitable principles apply even when the subrogation is based on contract, except as modified by specific provisions in the contract." Providence Washington Ins. Co. v. Hogges, 67 N.J. Super. 475, 482 (App.Div. 1961). Consequently, unless the subrogation agreement otherwise provides, both subrogor and subrogee enjoy the rights conferred by common law and are subject to its obligations as well.
As a matter of equitable principle, the right of subrogation does not arise until the injured party has been made whole. Hence, if one pays only part of the loss sustained by an injured party in circumstances in which the primary obligation to pay the entire loss falls on a third party, he is not entitled to be subrogated to the claim of the injured party against the third party, although he is entitled to reimbursement from the third party. Thus, the injured party in these circumstances is himself exclusively entitled to assert his claim against the third party subject only to that right of reimbursement. See, e.g., *501 Restatement, Restitution, § 162, comment c. at 653, 655 (1937).[2]See also Restatement, Security, § 141, comment e., illustration 10 at 383, 387-388 (1941). And see 6A Appleman, Insurance, § 4051, pp. 113-114; § 4094, pp. 265-266, 275; § 4096, p. 289.
This common-law rule withholding the right of subrogation until the injured party's claim has been paid in full is typically modified by contracts of insurance which provide for the insurer's right to subrogation to the insured's claim against the tortfeasor upon any payment by it to the insured. Nevertheless, the equitable principle of the paramount right of the insured to be made whole survives the contract unless otherwise provided.[3] Consequently, despite the insurer's general subrogation right, it is clear that if an insured who has recovered only part of his loss from his insurer then recovers an *502 additional payment from the tortfeasor, he has no liability to repay the insurer unless the total recovery exceeds his total loss. The rule formulated by Camden Fire Ins. Asso. v. Prezioso, 93 N.J. Eq. 318, 320 (Ch.Div. 1922), is that "the insured can be called upon to account to the insurer-subrogee, only if he has recovered more from the insurer and the wrong-doer than the total of his loss, and then only for the excess. The excess he holds in trust for the insurer." See also, adopting this formulation, Federal Insurance Co. v. Engelhorn, 141 N.J. Eq. 349, 351 (E. & A. 1947).
Conversely, an insurer who pays the insured only a portion of his loss and then exercises its subrogation right against the tortfeasor is required, as a matter of law, to allocate to the insured, out of the proceeds of its recovery, that sum which is equivalent to the difference between the insurance payment and the insured's actual loss. And this it must do before it may retain any part of the recovery for its own reimbursement. See, e.g., Providence Washington Ins. Co. v. Hogges, supra, 67 N.J. Super. at 479, recognizing the insured's "prior right" to recover the deductible in an automobile collision loss policy out of the proceeds of the insurer's subrogation recovery irrespective of the amount of the recovery.
We conclude, therefore, that just as the insured has a trust obligation to the insurer for any sum he recovers from the tortfeasor in excess of his actual loss, so does the subrogating insurer have a trust obligation to the insured in respect of the difference between the insurance payment and the insured's actual loss. Complementary considerations of public policy underlie the imposition of each of these trust obligations. Thus, the justification for requiring an insured to assign to the insurer his total claim against the tortfeasor even if the insurer has paid him only a portion thereof is to "protect the insurer from the insured's unilateral or fraudulent action that would *503 effectively deprive the insurer of the ability to recover the payments made by it under the policy." Appleman, supra, § 4053 at 138. By the same token, once the insured assigns his total claim to the insurer in consideration of payment of only part of his loss, the insured's first right to the proceeds of the subrogation action is necessary to protect him from the insurer's unilateral disposition of his claim in its own interest alone. In sum, it is the insured's prior right to the proceeds to the extent of his unreimbursed loss which alone provides the incentive for the insurer's diligent prosecution of the total claim assigned to it.
Applying these principles here, it appears that the agreement between the insured and insurer violated every concept of fair play which underlies the whole doctrine of subrogation. Plaintiffs suffered a substantial loss, less than half of which was paid for by INA. They were nevertheless required to assign to INA their total claim. Having received from INA only $82,000 of their total loss of $185,000, they were entitled to receive $103,000 out of the proceeds of the subrogation action before INA was entitled to any part thereof. Indeed, if the proceeds had exceeded $185,000, plaintiffs would also have been entitled to the excess. See Providence Washington Ins. Co. v. Hogges, op. cit., supra. In short, INA's right to retain the proceeds of the subrogation action was limited to the sum it had paid its insured.[4]
*504 Thus, but for the agreement entered into here, plaintiffs would have been entitled to a gross payment, before counsel fees, of $103,000 and defendant, by way of reimbursement, to the balance of the settlement proceeds, $57,000. It appears that INA's attorney was paid a fee of $40,000 representing 25% of the recovery plus $1,745.50 in costs, a total of $41,745.50. Plaintiffs would therefore have been chargeable with 103/160th thereof, or $26,874, for a net recovery of $76,126. Instead they received, by reason of the agreement, $23,583, and INA, whose recovery would have been limited to the $82,000 it paid plaintiffs, obtained a net recovery, after counsel fees, of $90,000.
Beyond the fact that the agreement appears to be unconscionable, violative of public policy, and in abrogation of INA's trust obligation to its insureds, it also appears that it was procured by at least two apparently inaccurate representations made by INA's attorney to plaintiffs, first that the subrogation action was unlikely to produce a recovery in excess of INA's original payment to plaintiffs on the policy and, second, that in any event, INA would be entitled to recapture that payment before plaintiffs could receive any portion of the recovery. Indeed, we read the portion of the certification of INA's attorney quoted supra virtually to so concede. Obviously, if plaintiffs relied on these misrepresentations, it hardly matters whether they were known to be false when made or not, since their falsity in fact would have resulted in an equitable, if not a legal, fraud. See Jewish Center of Sussex Cty. v. Whale, 86 N.J. 619 (1981).
We think it clear then that the facts of record here support plaintiffs' claim for relief from the order enforcing their agreement with INA. At the least, if there are material facts which might yet be the subject of dispute, plaintiffs are entitled to the opportunity to prove their right to relief. The question then is only whether, as the trial judge concluded, they are now barred from doing so by virtue of their failure to have appealed from the distribution order entered in the subrogation action following *505 the court's rejection of their challenge to their settlement agreement with INA.
In this respect, we view the complaint here filed as tantamount to a motion pursuant to R. 4:50-1 made in the subrogation action for relief from the distribution order. We are, moreover, satisfied that had this complaint been so styled, the inapplicability of a res judicata bar would have been evident since that preclusionary doctrine patently does not bar a direct challenge to a judgment made in the cause by an application for relief therefrom. Moreover, as we have already pointed out, plaintiffs' challenge to their agreement with INA was not actually adjudicated in the earlier proceedings. It is our distinct impression that the court's concern with preserving INA's settlement with the two tortfeasors misled it as to the actual grievance plaintiffs were attempting to present. It was not that settlement they were questioning but only their distribution agreement with INA. Had the court so appreciated, we are confident that it would have afforded plaintiffs the opportunity they should then have had of demonstrating their right to be relieved of it. Instead, the court made no inquiry as to either the terms of that agreement or the basis of plaintiffs' challenge to it and made no findings in respect thereof at all.
The circumstances now before us include such apparent elements as the unconscionability of the agreement itself, its violation of public policy, the breach of fiduciary obligation implicit therein, the misrepresentations by which it was procured, the trial court's denial of a fair opportunity to be heard, an apparently inequitable result, and a reasonably prompt challenge. These are circumstances which in their totality are clearly sufficient to invoke the court's remedial power pursuant to R. 4:50-1(f), which authorizes relief from a judgment or order for any reason justifying relief other than those stated in subsections (a) to (e) of the rule.[5]See, e.g., Court Invest. Co. v. *506 Perillo, 48 N.J. 334, 341 (1966), instructing that "the very essence of (f) is its capacity for relief in exceptional situations. And in such exceptional cases its boundaries are as expansive as the need to achieve equity and justice." See also Morales v. Santiago, 217 N.J. Super. 496 (App.Div. 1987); In re Green, 175 N.J. Super. 595 (App.Div. 1980); Tenby Chase Apartments v. N.J. Water Co., 169 N.J. Super. 55 (App.Div. 1979). This is such an exceptional case. We are, moreover, persuaded that plaintiffs should not be prejudiced in their quest for an equitable result by their error in filing a separate complaint in a new cause and thereby attempting to collaterally attack the offending order instead of seeking relief from that order by appropriate motion in the original cause.
Accordingly, we reverse the summary judgment dismissing the complaint and remand to the trial court, directing it to regard the complaint as constituting not only a demand for affirmative relief but also as the motion which should have been brought under R. 4:50-1(f). It shall then conduct such proceedings on the motion as it deems necessary and appropriate to determine whether plaintiffs are entitled to be relieved of the distribution order. If it concludes that they are, it shall then proceed to consider, as demanded by the complaint, the proper manner of distribution of the proceeds of the settlement of the subrogation action.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] Although the record does not indicate exactly when or why, it does appear that by the time of this settlement, Mrs. Culver was acting for both plaintiffs. We further note that INA's appellate counsel was not its trial attorney and did not in any way participate in any of the trial or pretrial events herein described.
[2] Comment c. explains that:

Where obligation not fully discharged. Where property of one person is used in partially discharging an obligation owed by another, and the balance of the obligation has not been discharged, the former is not entitled to be subrogated to the position of the obligee. Until the obligation is fully discharged, the obligee is himself entitled to enforce the balance of his claim, and the person whose property has been used in discharging only a part of the claim is not entitled to occupy his position. If the balance of the claim is subsequently discharged by the obligor, however, the person whose property was used in discharging a party of the obligation is entitled then to be subrogated to the claim to the extent that his property was used in discharging the claim.
Illustrations 1. and 2. make the point as follows:
1. A owes B $100 and C is surety for A on the debt. C pays B $25 in part payment of the debt. C is not entitled to be subrogated to B's claim against A, although he is entitled to reimbursement from A.
2. The facts are as stated in Illustration 1, except that A has paid B the balance of the debt. C is entitled to be subrogated to B's claim against A to the extent of $25.
[3] The language of the insurance policy here has not been provided to us. We nevertheless note that the statutory requirement for a subrogation clause on fire insurance, N.J.S.A. 17:36-5.20, lines 162 to 165, is of similar import to the clause considered by this court in Providence Washington Ins. Co. v. Hogges, supra, 67 N.J. Super. at 476.
[4] We cannot determine from this record if plaintiff's allegation respecting its total loss has ever been disputed. We have, for example, not been favored with inclusion in this record of any of the pleadings or other documents in the subrogation action. We do not, moreover, consider the question of attorney's fees in the subrogation action except to note that the proper method of allocation and payment of counsel fees is prescribed by Montefusco Excavating & Contracting Co. v. Middlesex Cty, 82 N.J. 519 (1980), which requires, as between subrogor and subrogee, that the one obtaining the benefits of litigation paid for by the other is obliged to make a pro rata contribution to the fees of the attorney who produced the fund.
[5] We note that relief might also be available pursuant to R. 4:50-1(c).