223 N.J. Super. 174 (1988)
538 A.2d 414
ZENTA LONGWORTH, PLAINTIFF,
v.
PETER VAN HOUTEN, DEFENDANT-RESPONDENT.
and
ZENTA LONGWORTH, PLAINTIFF-RESPONDENT,
v.
THE OHIO CASUALTY GROUP OF INSURANCE COMPANIES, DEFENDANT-APPELLANT.
CECELIA V. NASH AND JAMES S. NASH, HER HUSBAND, PLAINTIFFS-RESPONDENTS,
v.
PRUDENTIAL PROPERTY AND CASUALTY INSURANCE COMPANY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 26, 1988.
Decided March 1, 1988.
*175 Before Judges PRESSLER, MUIR, Jr. and SKILLMAN.
Alan H. Bernstein argued the cause for appellant The Ohio Casualty Group of Insurance Companies (Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, attorneys; Alan H. Bernstein, of counsel; Samuel N. Faivus, on the brief).
*176 William J. Vosper, Jr. argued the cause for respondent Longworth (Purcell and Vosper, attorneys; William J. Vosper, Jr., on the brief).
James D. Bride argued the cause for respondent Van Houten (W. Stephen Leary, attorneys; James D. Bride, of counsel; John Haschak, III, on the brief).
Robert A. Auerbach argued the cause for appellant Prudential Property and Casualty Insurance Company (Robert A. Auerbach, attorney; Robert A. Auerbach, of counsel; Randi S. Greenberg, on the brief).
William Emmett Sitzler argued the cause for respondents Cecelia V. Nash and James S. Nash, her husband (William Emmett Sitzler, attorney; William Emmett Sitzler, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
These appeals, which we have consolidated on our own motion, raise novel and complex questions not heretofore decided by the appellate courts of this state respecting underinsured motor vehicle coverage (UIM). Implicated here are the so-called exhaustion clause, the consent-to-settle clause, and the subrogation clause of typical UIM coverage. We are called upon to consider the interrelationship of these clauses and the extent, if any, to which they are enforceable.
Underinsured motorist coverage came into the statutory law with the passage of L. 1983, c. 65, § 5[1] and L. 1983, c. 362, § 1,[2] which amended N.J.S.A. 17:28-1.1. Prior to these amendments, that statute, adopted in 1968, required every automobile *177 liability policy to provide uninsured motorist coverage (UM) in the aggregate amount of $15,000/30,000. See, generally, Riccio v. Prudential Property & Cas. Ins. Co., 108 N.J. 493, 499 (1987), explaining that the mandated UM coverage was "designed to afford maximum protection to a state's residents, and to fill gaps in compulsory insurance plans," by creating a contractual right in the insured to recover from his own liability insurer at least a portion of the damages he sustained as a result of the negligence of the uninsured tortfeasor. The statute, however, then made no provision at all for UIM coverage although we understand that some carriers were in fact offering that protection to their insureds on a voluntary basis.
The predicate of the 1983 amendments was the Legislature's evident perception that in terms of obtaining an adequate recovery from a negligent driver, the victim, especially one sustaining serious injuries, is placed at financial risk not only by uninsured drivers but also by underinsured drivers, typically drivers with the minimum liability coverage of $15,000/30,000 permitted by the statute. The approach adopted by the Legislature was to require each insurer issuing an automobile liability policy not only to provide $15,000/30,000 of UM coverage but also to offer its insured the option of purchasing additional protection up to limits of his liability coverage but not exceeding $250,000/500,000 against the risk of underinsured as well as uninsured tortfeasors.[3] The effect of the coverage is to *178 require the insurer, as a matter of contractual agreement, to pay its insured, to the extent of the coverage purchased, the liability damages which the insured is entitled to from the negligent uninsured or underinsured tortfeasor less, in the case of the underinsured tortfeasor, the amount of the tortfeasor's coverage. The essential distinction between UM and UIM coverage is that if an uninsured tortfeasor is involved, his victim is able to seek initial and primary recourse from his own liability carrier. If an underinsured tortfeasor is involved, however, his victim may not pursue his contractual UIM right against his own liability insurer until he has first recovered the tortfeasor's liability limit by settlement or judgment. That recovery is then offset against the maximum UIM coverage provided for by the policy. Thus, the UIM, but not the UM, coverage has essential attributes of excess rather than primary protection. It is this distinction which creates the conceptual and practical problems presented by these cases.
We consider the facts of the cases before us against the background of this statutory development. The Longworth case arises out of an automobile accident which occurred on June 7, 1983. Plaintiff Zenta Longworth sustained serious injuries when her car, which she was driving, was struck in the rear by an automobile owned and operated by defendant Peter Van Houton. Van Houton was insured by Allstate Insurance Company, which had issued to him a minimum policy with liability limits of $15,000/30,000. Plaintiff was insured by defendant Ohio Casualty Insurance Company, whose policy *179 afforded her, among other benefits, liability coverage of $250,000/$500,000, UIM coverage of $50,000/100,000, and mandated personal injury protection. She instituted a negligence action against Van Houton in January 1984, and at about that time also advised Ohio that since her damages exceeded Van Houton's minimum insurance, she would be seeking further recovery under her own UIM coverage. While the precise sequence of events is unclear, it appears that in the period from late 1984 to early 1985, Allstate conceded the liability of its insured, Van Houton, and, upon plaintiff's refusal to give Van Houton a general release, deposited the policy limit into court. Plaintiff then demanded payment from Ohio of her UIM benefits, and upon Ohio's rejection of her demand, she brought a breach of contract action against it. That action was consolidated with the negligence action pending against Van Houton.
As we understand the positions taken by the parties in the consolidated litigation, Allstate, despite its concession of liability, refused to pay plaintiff its policy limits of $15,000 unless plaintiff gave its insured, Van Houton, a general release. Ohio asserted that plaintiff could not give him a general release without compromising the subrogation rights to which the policy would entitle it upon its payment of UIM benefits. Ohio also asserted that under the arbitration provision of the UIM coverage, its obligation to pay plaintiff UIM benefits could only be triggered by an arbitration award in its insured's favor. It therefore contended that the negligence action against Van Houton should be stayed and payment of the $15,000 deposited in court by Allstate held in abeyance until completion of its UIM arbitration with plaintiff. Ohio further contended that if plaintiff would not arbitrate with it before disposing of her claim against Van Houton, her only recourse would be a trial to judgment against him since any pre-judgment settlement between them would defeat its subrogation rights. Plaintiff, of course, took the position that since no party challenged the fact that her damages exceed $50,000, she had a clear and immediate right to receive both the Allstate policy limits which Allstate *180 had deposited into court and the full benefit of her UIM coverage. She thus asserted that the effect of Ohio's procedural maneuvers and substantive contentions was to leave her with no timely recovery at all.
Ultimately, in response to a variety of motions by the various parties, Judge Gascoyne reached a final disposition by concluding that both the consent-to-settle clause and the subrogation clause of Ohio's UIM coverage were unenforceable.[4]See Longworth v. Ohio Casualty Gp. of Ins. Co., 213 N.J. Super. 70 (Law Div. 1986). Consequently, the court ruled that plaintiff could give Van Houton a general release, thereby enabling her to accept Allstate's $15,000, and then arbitrate her UIM claim against Ohio. Ohio appeals from the order so providing. We further note that an arbitration between plaintiff and Ohio following final judgment resulted in a maximum award to her of an additional $35,000, namely the difference between her UIM limit and Van Houton's policy limit. See N.J.S.A. 17:28-1.1(e) and note 3, supra.
These are the facts in the Nash case. Plaintiff Cecelia V. Nash sustained serious injuries on August 3, 1984, when her vehicle was struck by a vehicle owned by Anne Baumann and driven by Edward Bowers. The Baumann vehicle was insured by Hanover Valley Forge Insurance Co. under a minimum *181 $15,000/30,000 policy. Nash was insured by Prudential Property and Casualty Insurance Company under a policy affording her, among other benefits, personal injury protection (PIP) and UIM coverage of $50,000/100,000. About a year after the accident, by letter dated August 22, 1985, Hanover offered Nash its $15,000 policy limit in exchange for the general release of its insureds, Baumann and Bowers. On September 11, 1985, Nash's attorney wrote to Prudential's claim representative, advising of the Hanover tender, demanding payment from Prudential under the UIM coverage, and requesting that the medical information obtained by Prudential for purposes of PIP payments be turned over to whomever at Prudential would evaluate the UIM claim. On October 7, 1985, not having received a reply, Nash's attorney again wrote to Prudential requesting the favor of a response to his earlier letter. On October 29, 1985, Hanover reiterated its offer to Nash's attorney, asking to be advised of his intentions. This letter prompted another demand by Nash on Prudential, which was apparently unanswered. On February 25, 1986, Hanover wrote to Nash's attorney again, this time enclosing a general release of its insureds for Nash to sign. Finally, on March 7, 1986, a Prudential claims representative telephoned Nash's attorney with the offer itself to pay Nash the $15,000 Hanover had offered in order to protect its subrogation rights. No offer was apparently then made on its UIM obligation. Nash, with the advice of counsel, chose to reject Prudential's offer and to accept the Hanover offer, which she did on March 7, 1986 by executing the requested general release. Counsel so advised because of his concern as to the potential effect of accepting Prudential's offer on his client's UIM rights in view of the fact that neither the statute nor the policy provided for any mechanism by which the UIM carrier would so acquire its insured's rights against the minimally insured tortfeasor.
After releasing Hanover's insureds and obtaining payment of the $15,000 policy limit, Nash made demand on Prudential once again for UIM benefits. Prudential refused, claiming that *182 Nash's settlement with Hanover resulted in the forfeiture of her UIM coverage. In so asserting, Prudential relied on the exhaustion, consent-to-settle, and subrogation clauses of the policy. The exhaustion clause provided as follows:
We won't have to make any payments under this coverage until all the bonds and insurance policies which apply to the injury and/or property damage have been used up in paying court judgments or settlements.
The consent to settle clause provided as follows:
You may not settle with anyone responsible for the accident without our written consent.
And finally, the subrogation clause provided as follows:
If we pay any person under this part, we're entitled to get back that amount from any settlement or judgment that person makes with anyone responsible for the injury. Persons receiving payments from us must hold in trust for us any rights of recovery they have against anyone responsible for the accident and must do whatever is necessary to guarantee these rights and may not do anything to interfere with these rights. If we request it in writing, persons who have received payments from us under this part must do anything necessary in their own name, through any representative we designate, to recover these payments as damages from those responsible for the accident. Out of any amount recovered, they must pay us back any expenses, costs and lawyers' fees which we incurred helping them make this recovery. Persons receiving payments from us under this part must also provide us with any legal documents necessary to secure their rights and ours as outlined here.
Nash then instituted this action against Prudential to recover UIM benefits, and Prudential filed a third-party complaint against Nash's attorney, claiming that his advice to his client to reject its offer to pay her the Hanover policy limits was the true cause of her damage. In effect, Prudential argued that whatever constraints public policy might place on the insurer's reliance on these three key provisions of the UIM coverage were obviated by its offer to stand in the stead of Hanover with respect to its $15,000 policy limit.
On motion and cross-motions for summary judgment, Judge Haines dismissed the third-party complaint and adjudicated Nash's rights to obtain benefits under her UIM coverage. In reaching this conclusion, he concurred with Judge Gascoyne's holding in Longworth, supra, that the subrogation and consent-to-settle clauses were invalid as violative of public policy. It *183 was Judge Haines' further view that under the circumstances here, Prudential's effort to protect its right of subrogation against the tortfeasors by offering itself to pay their policy limit did not bar Nash from settling with the tortfeasors and prosecuting her UIM claim. Prudential appeals from the judgment accordingly entered.
We affirm both judgments.
We start our analysis with the subrogation clause in the context of the consent-to-settle clause. We note preliminarily that the right of subrogation is a common-law equitable remedy customarily included in policies of direct insurance so that an insurer obligated by the insurance contract to pay benefits to its insured is able to seek reimbursement from the tortfeasor whose wrongdoing was the cause of the insured's loss. See Aetna Ins. Co. v. Gilchrist Brothers, Inc., 85 N.J. 550, 560 (1981). We see no reason why a UIM carrier, as an abstract matter and considering only the interests of the insurer and the tortfeasor, should not have a right of subrogation against the wrongdoing, underinsured tortfeasor. The problem with the right of subrogation is, however, the adverse effect which subrogation has on the statutorily-accorded competing and paramount right of the insured victim to seek as full a recovery as possible from the combined resources of the tortfeasor's liability carrier and his own UIM carrier under a scheme which apparently requires recovery from the tortfeasor's insurer as a prerequisite to recourse to the UIM coverage.
Obviously, the victim may recover from the tortfeasor only by judgment or settlement. Obtaining judgment requires the institution of litigation with all its inevitably attendant delay and expense. It would thus ordinarily be in the best interests of a victim whose damages exceed the tortfeasor's coverage to settle as expeditiously as possible with the tortfeasor's insurer for or close to the policy limits and then promptly to resort to his own UIM coverage. But as a practical matter, the victim can only settle with the underinsured tortfeasor by giving him a *184 general release. This is so since the tortfeasor's insurer, which controls settlement negotiations and any litigation against the tortfeasor as well as the pocketbook (up to the policy limits), owes a duty to its own insured, the tortfeasor, to provide him with the protection of a general release as a condition of settlement. But since the giving of a general release by the victim extinguishes any further right the victim might have against the tortfeasor, it also extinguishes the UIM carrier's right of subrogation against the tortfeasor, that right being no greater than the victim's own remaining right against the tortfeasor. See Montefusco Excavating & Contracting Co. v. Middlesex Cty., 82 N.J. 519, 523 (1980). Thus, the sole function of the consent-to-settle clause is the preservation of the subrogation right. Consequently, the victim cannot simultaneously give a release to the tortfeasor and protect his UIM insurer's right to subrogation. If he gives a release, he will have extinguished his UIM carrier's right of subrogation, an act which, under the policy, affords the carrier grounds for disclaiming its UIM liability. If he will not give a release, he cannot settle with the tortfeasor and, consequently, he will be able to seek recovery under his UIM endorsement only if he proceeds to judgment against the tortfeasor, incurring the expense and delay of litigation, even where the tortfeasor's carrier is willing to pay and he is willing to accept the policy limits.
The limbo into which the insured victim is thus cast by reason of the UIM carrier's asserted right of subrogation, as protected by the consent-to-settle clause, utterly frustrates the legislative purpose of providing maximum and expeditious protection to the innocent victims of financially irresponsible motorists.[5] It also frustrates the legitimate expectations of the insured victim who purchases UIM coverage. The Supreme Court in Ciecka v. *185 Transamerica Insurance Group, 81 N.J. 421, 428 (1979), reaffirmed its commitment to "the socially desirable policy of adequate indemnification of innocent automobile accident victims" by adhering to the course "of liberally construing legislation involving automobile insurance to effect `the broadest protection of auto accident victims consistent with the language of the pertinent statute.'" The operation of these two clauses flouts all of these desiderata. As Judge Gascoyne noted, their tandem effect
delays compensation rather than promoting prompt compensation, increases litigation rather than decreasing litigation, chills settlement and compromise rather than encouraging out of court resolution of claims and seeks to give control of the litigation [against the tortfeasor] to [the UIM carrier] where such authority is not conferred by statute. [213 N.J. Super. at 81]
We agree and consequently conclude that the subrogation and consent-to-settle clauses in the UIM endorsement, as written, contravene public policy because they so dramatically impede effectuation of the legislative design in providing for UIM coverage and because they so impinge on the insured's right to manage and dispose of his prerequisite claim against the tortfeasor. In so holding, we follow the lead of those judicial authorities and scholarly texts which have also so concluded for substantially similar reasons. See Schmidt v. Clothier, 338 N.W.2d 256 (Sup.Ct.Minn. 1983); Vogt v. Schroeder, 129 Wis.2d 3, 383 N.W.2d 876 (Sup.Ct. 1986); Hamilton v. Farmers Ins. Co. of Washington, 107 Wash.2d 721, 733 P.2d 213 (Sup.Ct. 1987). See also Hentemann, "Underinsured Motorist Coverage; A New Coverage with New Problems," 50 Ins. Coun.J. 365 (1983). And compare Government Employees Ins. Co. v. Shara, 137 N.J. Super. 142 (Ch.Div. 1975). But see contra March v. Mountain States Mut. Cas. Co., 101 N.M. 689, 687 P.2d 1040 (Sup.Ct. 1984).
The adverse impact of these clauses on the remedial predicates of UIM coverage is, moreover, so evident in these circumstances that the defendant UIM insurers here, despite their *186 earlier protestations to the contrary,[6] both conceded at oral argument that the subrogation and consent-to-settle clauses, read literally, would violate public policy. The modified position taken by the insurers at oral argument is that the validity of these clauses can be saved by a "proper" application of the consent-to-settle clause. In sum, the argument made, and particularly by Prudential in the Nash case, is that pursuant to the consent-to-settle clause, the insured has a primary obligation to advise his UIM carrier that he has a settlement offer from the tortfeasor of the policy limits which he, the UIM insured, proposes to accept. This notice would then require the UIM carrier to evaluate the magnitude of the insured victim's claim, the tortfeasor's negligence, and the prospect of further recovery from the tortfeasor himself in order to determine whether to consent to the settlement. Its consent to the settlement would constitute a waiver of its subrogation rights against the insured and would consequently permit the insured to accept the settlement and then proceed directly against the UIM coverage. If, on the other hand, the UIM carrier did not wish to waive its subrogation rights, it could preserve them only by paying its insured the amount of the settlement offered him by the tortfeasor. It would then succeed to the insured's right both in respect of the tortfeasor's policy limit and to any excess amount recoverable from the tortfeasor himself.
*187 It is first clear that the foregoing construction of the import of the consent-to-settle clause is hardly apparent on the face of the policy. We also have no doubt that the inspiration for this after-the-fact constructional thesis is the holding of the Minnesota Supreme Court in Schmidt v. Clothier, supra. Schmidt involved two unrelated but consolidated cases in which each of the plaintiffs was a UIM insured of Safeco Insurance Company. Each of the insureds wished to accept a settlement offered by the respective tortfeasor's carrier, and in each case Safeco refused to consent. The insureds accordingly each moved before the trial court in the negligence action pending against their respective tortfeasors for an order authorizing them to accept the settlement and to release the tortfeasor without an impairment of their respective UIM rights. In each case the trial judge accorded that relief, subject, however, to a 10-day period in which Safeco could opt to pay its insured the settlement offered by the tortfeasor in order to preserve its subrogation rights. The Minnesota Supreme Court affirmed these orders, concluding that the option thus afforded the UIM carrier effected a reasonable accommodation of all the conflicting interests involved. As the Court explained,
If, on the other hand, damages were substantially more than the liability limits and the tortfeasor had substantial assets, the underinsurer could substitute its payment to the insured in an amount equal to the tentative settlement. In this situation, the underinsurer's payment would protect its subrogation rights to the extent of the payment, and the insured would receive the amount of the settlement offer in cash. The underinsurer would then have to arbitrate the underinsured claim and could, thereafter, attempt to negotiate a better settlement or could proceed to trial in the insured's name. We note again that prompt assessment, arbitration, and payment of underinsurance claims will protect the underinsurer's subrogation rights, and the underinsurer will avoid having to choose later between either acquiescing in the settlement or substituting its check for the amount of the settlement offer. [338 N.W.2d at 263]
The Court, however, concluded that the 10-day period afforded by the trial court was too brief, holding that "in the future 30 days from the written notice of the tentative settlement agreement is a more reasonable time period, and so the procedure set out in the district court orders should hereafter be modified." Wisconsin and Washington have followed the lead of Schmidt. *188 See Vogt v. Schroeder, 129 Wis.2d 3, 383 N.W.2d 876 (Sup.Ct. 1986); Hamilton v. Farmers Ins. Co. of Washington, 107 Wash.2d 721, 733 P.2d 213 (Sup.Ct. 1987).
Defendant insurers ask us to follow Schmidt as well. Even if we were to do so, however, Schmidt would be of no avail to either defendant here. In the Longworth case, Ohio never offered to pay to its insured the tortfeasor's liability limit despite the fact that it was on notice of the full particulars of plaintiff's claim against both him and it for many months prior to the entry of the judgment from which it appeals. Indeed, as we understand it, both the tortfeasor's policy limit and the UIM arbitration award have been deposited in court and plaintiff has not yet actually recovered any portion of her damages.
It is true that in the Nash case Prudential finally did offer to pay plaintiff the tortfeasor's policy limit. In our view, however, that offer came too late to be encompassed by the Schmidt rationale, which is designed at least in part to expedite payment to the insured victim. As we have noted, Schmidt itself prescribes a 30-day period in which the UIM insurer must make its decision. Both jurisdictions which have elected to follow Schmidt emphasize the significance of the insurer's speedy response to its insured's notice of the settlement offer made by the tortfeasor. See Vogt v. Schroeder, supra, 383 N.W.2d at 884, noting that the "slight delay" in payment occasioned by the UIM carrier's assessment of the value of its subrogation rights is justified because "at the end of the period, the insured will receive the amount due under its policy." Hamilton v. Farmers Ins. Co. of Washington, supra, 733 P.2d at 220, similarly so notes.[7] Here Prudential received notice from its insured of the tortfeasor's offer in September 1985. Its offer to pay her that sum was not made until March 1986, six months later. We conclude that the offer was untimely and *189 consequently did not bind plaintiff. We point out, moreover, that Prudential's explanation of its delay is unimpressive. It asserts that it needed the time in which to evaluate the severity of plaintiff's injuries and therefore had requested plaintiff to furnish additional medical reports which were slow in coming. Prudential was, however, plaintiff's PIP carrier as well as her UIM carrier and already had all of the necessary medical data, a fact which plaintiff's attorney had brought to its attention in his original communication to it of the tortfeasor's offer.
Thus, since neither insurer here made a timely proposal to its insured to pay the tortfeasor's settlement offer, there was in fact no countervailing offset of those considerations which dictate the unenforceability of the subrogation/consent-to-settle clauses as written. For that reason alone, we affirm the judgments, remitting both plaintiffs to their UIM remedy.
We nevertheless add the following observations. Beyond the inapplicability of the Schmidt rationale to the facts of these cases, we have also concluded that it would be imprudent to adopt the Schmidt 30-day rule as a guide for the future conduct of UIM carriers. We endorse the Schmidt concept that the UIM insurer's payment to its insured of the tortfeasor's liability limits reasonably accommodates the conflicting interests of insurer and insured. We also endorse the concept that the effectiveness of that accommodation requires a prompt response from the UIM insurer to notice to it by the insured of the tortfeasor's settlement offer. We hesitate, however, ourselves to amend the contract of insurance by either requiring that procedure or imposing thereon a 30-day time limit. As to the 30 days, there are simply too many variables to permit us to assume that that time frame will always be reasonably expeditious. Thus, if the tortfeasor's offer is made very shortly after the accident, the insurer may well need more time in which to evaluate the claim. If, on the other hand, litigation has already commenced, 30 days may be much too long. Thus, for example, if the tortfeasor's offer is made shortly before or at the commencement of trial, the 30-day period may not terminate *190 until the trial has been concluded. In that situation, the UIM insurer may have to respond within days, hours or minutes in order for plaintiff to be spared the necessity of continuing to trial despite an acceptable offer.
We are also concerned with the litigation complexities inherent in the UIM carrier acquiring its insured's claim against the tortfeasor during litigation and especially at or close to the time of trial. Presumably, the insurer would continue the litigation in the insured's name with its own counsel who would be substituted for the insured's attorney. Even if we were to assume that change of attorney were practical in the given circumstances, it is clear that the litigation against the tortfeasor so conducted could not be binding on the insured vis-a-vis his UIM claim against the carrier. This is so because of the evident conflict of interest between insured and insurer as to both the tortfeasor's liability and the amount of the judgment against him. Thus, arbitration of the UIM claim would still have to take place. Conversely, if the insured's attorney continues with the litigation, the UIM insurer might be prejudiced in its subrogation rights. All of these problems would be exacerbated if the litigation were multi-party. Thus, as a practical matter, there may be a point in the litigation at which the Schmidt procedure cannot provide a reasonable accommodation. Nevertheless, even at that point and beyond, the insured should be able to accept a settlement offered by the tortfeasor even if it means the loss of the UIM insurer's subrogation rights.
In substantial measure, the failure of accommodation in these circumstances is attributable to the exhaustion clause of the UIM coverage. That clause is not directly before us since the liability carrier for both tortfeasors here offered the full policy limit well before trial. Indeed, in Nash litigation was not even begun. We nevertheless address that clause because of its inextricable entanglement in the subrogation problem. The exhaustion clause requires that the insured settle with or obtain *191 judgment against the tortfeasor in the full amount of the tortfeasor's own liability coverage before the UIM carrier has any payment obligation at all under the UIM coverage. The adverse impact of this clause on the legislative purpose in providing for UIM coverage is immediately apparent. It means that the tortfeasor's carrier, by offering to settle for a sum somewhat less than the policy limits, can force the victim to trial solely in order to protect his UIM claim. In effect then, the victim is denied the perfectly reasonable choice of saving months, if not years, of delay, trial preparation expense, and all the ensuing wear and tear by simply accepting the offer and, as a condition of proceeding with his UIM claim, foregoing the difference between the tortfeasor's policy limit and the tortfeasor's insurer's offer. This was in fact the situation in Schmidt. In one of the cases there reviewed, the tortfeasor's carrier offered to settle with the victim for $22,000 out of a $25,000 liability policy. One of the questions was whether the insured could accept the offer without impairing his UIM rights. The court concluded that because the exhaustion clause in this respect was unenforceable, it could not bar the insured's right to accept the offer. It reasoned as follows:
The purposes of the no-fault act, noted above, include those of easing the burden of litigation and encouraging prompt payment of claims. Enforcement of policy exhaustion clauses would produce results contrary to those purposes. It could serve to force an insured to litigate the claim to final judgment in order to exhaust the policy limits. Litigation expenses would lessen the insured's net recovery, the time involved in litigation would serve to delay payment to the insured, and the litigation itself would unnecessarily burden our court system. Where the best settlement available is less than the defendant's liability limits, the insured should not be forced to forego settlement and go to trial in order to determine the issue of damages. The insured has the right to accept what he or she considers the best settlement available and to proceed to arbitrate the underinsurance claim for a determination of whether the damages do indeed exceed the tortfeasor's liability limits. [338 N.W.2d at 260-261]
We agree completely. We agree as well with Schmidt's further conclusion that if the victim does accept less than the tortfeasor's policy limits, his recovery against his UIM carrier must nevertheless be based on a deduction of the full policy limits.
*192 We are aware that N.J.S.A. 17:28-1.1(e) contains exhaustion language, providing that
[a] motor vehicle shall not be considered an underinsured motor vehicle under this section unless the limits of all bodily injury liability insurance or bonds applicable at the time of the accident have been exhausted by payment of settlements or judgments.
This exhaustion language is, however, included in definitional terms rather than in the circumscription of the insured's substantive right against his UIM carrier. The substantive right is defined not in exhaustion terms but rather in terms of payment received, that section of the statute further providing that "[t]he limits of underinsured motorist coverage available to an injured person shall be reduced by the amount he has recovered under all bodily injury liability insurance or bonds." The requirement that the insured obtain the tortfeasor's entire policy limits as a condition of prosecuting his right to UIM benefits is so antithetical to the policies underlying the statute that we are constrained to conclude that the Legislature could not have so intended. We thus construe the statute as intended only to limit the amount recoverable under the UIM coverage by requiring deduction of the tortfeasor's full available policy limit, whether or not that limit is actually paid to the victim.
Our final reason for rejecting the Schmidt procedure is based on our perception that there may well be better procedures available for serving all of the interests fairly and expeditiously. In our view, the real root of the problem is the policy requirement and arguably the legislative requirement as well that the insured victim finally dispose of his claim against the tortfeasor before his UIM carrier's obligation matures. Thus, while a seriously injured innocent victim whose tortfeasor is uninsured has an immediate right to resort to the contractual coverage he purchased from his liability carrier, the seriously injured victim who has the misfortune to become involved with a minimally insured tortfeasor may have to wait years before being able to resort to his contractual coverage.
*193 We have difficulty in concluding that this anomaly was legislatively intended. We are of the view that the legislative scheme in respect of UM and UIM coverage was intended to be basically congruent in affording the insured a contractual right against his own insurer to compensate at least in part for the tortfeasor's insurance inadequacy. Whether that inadequacy is no insurance at all or underinsurance has no conceptual consequence since, under the legislative scheme, the insured victim's contractual recovery is in both cases limited to the amount of the coverage purchased from his own carrier. The only difference is that in the case of no insurance, the carrier is obligated to pay its own insured up to the coverage limit. In the case of underinsurance, the carrier is obligated to pay its insured up to the coverage limit less the tortfeasor's coverage limit. Everything else is the same. That being so, it is clear to us that the most efficient procedure and the procedure most nearly comporting with the legislative intent would be to permit the insured victim, at his option, to pursue his remedy under the UIM coverage without first having to conclude his claim against the tortfeasor. If the consequent arbitration resulted in a finding of the tortfeasor's liability and an award of damages in excess of the tortfeasor's coverage, the insured victim would be entitled to recover from the UIM carrier on the UIM claim, namely, in the amount of his actual damages or the UIM limit, whichever is less, reduced by the tortfeasor's coverage limits. At that point, whether or not the insured had yet received an offer from the tortfeasor, the UIM carrier could determine whether it wished to preserve a subrogation right against the tortfeasor. If it did, it could also pay its insured the tortfeasor's policy limit and itself prosecute the claim against the tortfeasor.[8] If it did not, its insured would be free *194 to continue to proceed against the tortfeasor in any manner he chose. Such a procedure would leave all of the parties precisely where they now are, but it would leave them there much more quickly, much more economically, and much more expeditiously. Another variant of this procedure would require the UIM carrier, following the arbitration, to pay its insured up to the entire UIM coverage, including the tortfeasor's policy limit and then to permit it to make appropriate adjustment with the tortfeasor's carrier for credit for the tortfeasor's liability limits. Leaving these adjustments to inter-company calculation would accomplish precisely the result intended by the statute at absolutely minimum expense and delay to victims.
As we have indicated, however, it is not our function to rewrite contracts of insurance. We have suggested a variety of ways in which the insurance industry itself can rewrite the UIM policy in a manner which will reconcile the purpose of the statute with the legitimate rights of all the affected parties. It may also be that the Legislature will prescribe an appropriate method for achieving that goal or that the Commissioner of Insurance will do so. We go only so far as to hold that as presently written, the subrogation clause, consent-to-settle clause, and exhaustion clause, in combination, frustrate that goal. We further hold, until a definitive response comes from the Legislature, the Commissioner or the industry, that, as a matter of future conduct, an insured receiving an acceptable settlement offer from the tortfeasor should notify his UIM carrier. The carrier may then promptly offer its insured that sum in exchange for assignment to it by the insured of the claim against the tortfeasor. While promptness is to be ultimately determined by the circumstances, 30 days should be regarded as the presumptive time period if the insured notices his carrier prior to assignment of a trial date. In any event, an insured who has not received a response from his carrier and *195 who is in doubt as to whether acceptance of the tortfeasor's offer will impair his UIM rights may seek an immediate declaratory ruling from the trial court on order to show cause on such notice as is consistent with the circumstances. We further hold that UIM carriers may, if they choose, honor demands from their insureds to proceed to arbitration of the UIM claim prior to disposition of the claim against the tortfeasor.
The judgments appealed from are affirmed.
NOTES
[1] Part of the New Jersey Insurance Reform Act of 1982 and the New Jersey Fire Insurance Availability Act.
[2] New Jersey Automobile Insurance Freedom of Choice and Cost Containment Act of 1984.
[3] As a matter of the remedial technique adopted in N.J.S.A. 17:28-1.1, paragraph (b) provides that the liability insurer must offer its insured the option of purchasing both UM and UIM coverage up to limits of $250,000/$500,000 for the tortfeasor's liability for bodily injury and $100,000 for his liability for property damage. That provision of the statute provides an alternative maximum coverage for property damage, namely a $500,000 single limit subject to a $250 deductible. That section of the statute also limits UM and UIM coverage to the amount of liability coverage purchased by the insured. Paragraph (c) of the statute precludes stacking of coverage. Paragraph (d) expressly subjects UM, but not UIM, coverage to the "terms, conditions and exclusions approved by the Commissioner of Insurance, including but not limited to unauthorized settlements, nonduplication of coverage, subrogation and arbitration." Paragraph (e) in pertinent part defines an underinsured vehicle as one which is covered by total liability insurance in an amount less than the victim's UIM coverage. Paragraph (e) further provides that the amount of the victim-insured's UIM coverage available to compensate him for the damages caused by the tortfeasor is his UIM coverage limit less the sum the insured has received from the tortfeasor under all the tortfeasor's liability insurance. This deduction provision of thestatute comports with pre-statutory judicial construction of voluntarily offered UIM coverage in this state. See Wert v. Picciano, 189 N.J. Super. 178 (Law Div. 1982).
[4] There is considerable confusion in the record respecting the actual text of Ohio's UIM coverage. No single integrated policy was ever marked into evidence or included in full as an exhibit attached to any of the certifications. Instead, various pages, sometimes having inconsistent provisions, were annexed to various of the certifications. Moreover, Ohio's policy here in question was written prior to the effective date of the 1983 amendment of N.J.S.A. 17:28-1.1, although it is suggested to us that its critical provisions do not materially differ from those in the policies it wrote thereafter. In order to determine the rights of the parties to this litigation, we understand that both plaintiff and Ohio ask us to assume that the UIM coverage conformed with typical industry-wide language in effect after the effective date of the amendment. We regard this request as salutary and therefore decide the issues before us as if the consent-to-settle and subrogation clauses were in the form in which they appear in the Prudential policy in the Nash case.
[5] That purpose was attributed to UM coverage by Riccio v. Prudential Property & Cas. Ins. Co., supra, 108 N.J. at 503. We regard it as no less applicable to UIM coverage.
[6] The argument upon which the insurer had chiefly relied was based on N.J.S.A. 17:28-1.1(d), which, as noted, subjected UM coverage to the approval of the Commissioner of Insurance, whose review is to extend to all terms, conditions and exclusions including, but not limited to, "unauthorized settlements, nonduplication of coverage, subrogation, and arbitration." They contend that since subrogation was thus implicitly recognized as a proper component of UM coverage, it should be so recognized in respect of UIM coverage. We point out, however, that neither record before us contains any proofs as to the Commissioner's evaluation of such clauses in UM insurance. We note, moreover, that because the insured victim has an immediate right of recourse against his own insurer in respect of UM coverage, the UM carrier's exercise of a right of subrogation against the uninsured driver is attended by considerably fewer complexities than an exercise of the right against an underinsured driver. Cf. Riccio v. Prudential Property & Cas. Ins. Co., supra, 108 N.J. at 505.
[7] Indeed, both of these decisions go beyond Schmidt by assuming that the UIM carrier, if it opts to pay its insured the tortfeasor's policy limit, will also at the same time pay the UIM claim as well.
[8] While we have not here addressed the respective rights of the UIM insured and UIM insurer to the proceeds of the insurer's recovery against the tortfeasor, it is clear that any sum recovered by the insurer in excess of the amount paid by it to its insured would belong to the insured. See, e.g., Hamilton v. Farmers Ins. Co. of Washington, supra, 733 P.2d at 220. And see Culver v. Ins. Co. of North America, 221 N.J. Super. 493 (App.Div. 1987).