286 N.J. Super. 73 (1995)
668 A.2d 92
PRUDENTIAL PROPERTY AND CASUALTY COMPANY, PLAINTIFF,
v.
KEYSTONE INSURANCE COMPANY OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division, Burlington County.
Decided July 28, 1995.
*75 Debra A. Hart, for plaintiff (Robert A. Auerbach, attorneys).
Steven E. Feld, for defendant (Gercke, Dumser & Feld, P.A., attorneys).
*76 WELLS, A.J.S.C.
This is a declaratory judgment action by Prudential to determine that it is an excess carrier as to certain underinsured motorist (UIM) benefits and that the defendant, Keystone Insurance Company, is the primary carrier. Prudential has actually paid the benefits to its insured, Kristi Giordano, and therefore the effect of a ruling in its favor would be an order directing Keystone to reimburse Prudential. Keystone's defense is that it received no Longworth notice of Giordano's intended settlement with a tortfeasor, Hector Velez, and it is not obligated to pay. See Longworth v. Van Houten, 223 N.J. Super. 174, 538 A.2d 414 (App.Div. 1988); Rutgers Cas. Ins. Co. v. Vassas, 139 N.J. 163, 652 A.2d 162 (1995). The parties have filed cross motions for summary judgment.
The underlying facts are simple and not disputed. The insurance facts are more complex but cannot be considered unique or even unusual. On September 9, 1990 Kristi Giordano was traveling as a passenger in a car operated by Patrick Gallagher. According to the subsequent accident investigation report, a vehicle operated by Hector Velez ran an intersection stop sign and the two cars collided causing injury to Kristi, Patrick and to another passenger in the Gallagher vehicle. Velez was covered by a JUA policy bearing the minimum limits of $15/30. The Gallagher car was covered by Keystone and had limits of $50/100. That policy also contained provisions for UM/UIM coverage of similar limits. Kristi also had a policy covering her personal auto issued by Prudential having limits of $100/300 and UM/UIM coverages of identical limits.
It is thus clear that Velez and Gallagher were "underinsured" as to Kristi when one compares their respective liability coverages with hers. N.J.S.A. 17:28-1.1(e) Ultimately, the three injured victims were able to settle with Velez's carrier for its policy limits of $30,000 by agreeing to split the coverage equally, $10,000 each. Gallagher put Keystone on notice under Longworth by letter dated November 19, 1992, of his proposed settlement with Velez and his intent to seek underinsured benefits from Keystone. *77 Keystone consented to the settlement. On November 20, 1992, Kristi sent a similar letter to Prudential, her carrier, and it also consented to the proposed settlement with Velez. As a result, that settlement was finalized in January, 1993, and a full and final release was tendered to and accepted by Velez.
It is at this point that the plot thickens. After the Velez settlement had been completed, Kristi for the first time sent Keystone a Longworth notice, apparently at Prudential's urging. See letter of Kristi's counsel dated January 29, 1993, and Keystone's response dated February 8, 1993. In the exchange of correspondence which followed Prudential took the position either (1) that Keystone was the primary carrier as to UIM benefits payable to its insured Kristi Giordano; or, (2) that Keystone should share pro rata in any award of such benefits to Kristi. Keystone flatly denied both such propositions contending that UIM coverage was "personal" to the insured, that Kristi was Prudential's insured, and, therefore, it must pay her any UIM benefits. Both carriers were put on notice of UIM arbitration and ultimately a court order was entered compelling Keystone to participate therein. Due to an adjournment of the hearing of which Keystone received no notice, its representative was not present and the Arbitrators awarded Kristi $60,000 and found Velez 90% negligent.[1] Prudential paid Kristi $44,000 from its UIM coverage ($60,000 less the $10,000 settlement from Velez and $6,000 paid by Keystone from its liability coverage as host driver).
In defense of Prudential's motion, Keystone has shifted its position. By reading its own policy, especially the "other insurance" provisions against the "other insurance" provisions of the Prudential policy, as well as such cases as Prudential v. Travelers, 264 N.J. Super. 251, 258-260, 624 A.2d 600 (App.Div. 1993); Royal *78 Insurance Co. v. Rutgers Cas, 271 N.J. Super. 409, 638 A.2d 924 (App.Div. 1994), Keystone has apparently decided that the law is that it is, indeed, primary as to UIM coverage for Kristi in this case.[2] It, therefore, now takes the fall-back position that it did not receive a Longworth notice from Kristi and did not, therefore, know about, let alone consent to, her settlement with Velez. It claims inherent prejudice to its subrogation rights against Velez emerging out of the release given to settle the case.
The issues for this court, then, are: does the Longworth procedure require notice of an offered settlement with the tortfeasor not only to the insured's own company but also to other carriers who might be primary for UIM coverage? If so, who is obligated to give that notice? If the notice is not given, may the claim still be made that the primary carrier has not been prejudiced by the failure of notice and may, notwithstanding, be obligated to pay the UIM benefits?
The entire Longworth procedure has recently been blessed by the Supreme Court in the case of Rutgers Cas. Ins. v. Vassas, 139 N.J. 163, 652 A.2d 162 (1995). The Court pointed out how imbedded the procedure has become amongst insurers and the bar and quoted a treatise on the equitable balance that the doctrine achieves among various competing interests. Rutgers Id. at 174, 652 A.2d 162. Under the circumstances it would seem imprudent *79 for this court to limit a procedure which is recognized as salutary and widespread. Furthermore, there is no reason to hold that a "primary" carrier as to UIM benefits is any less entitled to notice of a proposed settlement than the injured party's own carrier. No one argues a primary UIM carrier has any less right to subrogation than would the insured's own carrier. For those reasons I hold that a primary UIM carrier has a right to a Longworth notice within a reasonable time before any final settlement with a tortfeasor whereby that tortfeasor would be given a general release.
The court does, however, question whether it is prudent to place the onus of giving the required additional notice on the injured party. Under the Longworth procedure injured parties will generally preserve their UIM benefits by placing their own carriers on notice of proposed settlements with tortfeasors. That is relatively easy and, as the Supreme Court has pointed out, has become the standard practice. Vassas, supra. In that sense UIM coverage is personal to the insured. Aubrey, supra. There would be certainty as to who to notify. But shall accident victims now also be charged with knowledge, not only of the content of their own policies, but also of the policies of others involved in the accident, as well as the judgment to discern which policy is primary for UIM coverage and which is excess? Whether a policy is excess to that of other available coverage or is "co-primary" is a sophisticated issue of insurance law dependant upon a close reading and understanding of policy language. It is a thicket from which even lawyers will shy. Is it not placing too much responsibility and risk on the shoulders of injured claimants for them to give notice to a putative "primary" carrier other than their own?
Consideration of these questions leads the court to the conclusion that the duty to notify precedes the right to recover. That is, in the normal situation, recovery of UIM benefits under Longworth depends upon notice to one's own UIM carrier that the tortfeasor has offered a settlement. In turn, if the noticed carrier takes the position that its policy is excess or "co-primary" it, not *80 the insured, has the duty to relay that notice to the alleged primary carrier promptly, and provide that carrier reasonable time to consent or to tender the settlement amount to protect its subrogation rights. In that fashion the excess carrier takes both the responsibility and the risk attendant to the protection of its own interest. I recognize that sorting out the primary-excess issue may well require more time than the presumptive 30 day notice period set forth in Longworth. Therefore, the carrier claiming coverage as excess should also promptly alert its insured of its position and of the potential delay necessary to resolve this additional issue. An unreasonable delay, however, would allow the excess carrier either to consent or to tender a matching offer without prejudice to its rights over against the primary carrier. Failure on the part of the injured claimant's own carrier to relay notice to the alleged primary carrier would, in most cases, be fatal to its right to recover UIM benefits paid to its insured.
I have said "in most cases" advisedly because it is conceivable that the failure to relay the Longworth notice to the primary carrier might not be prejudicial in all cases. For example, in this case, Prudential, which, it is conceded, did not timely relay its Longworth notice to Keystone[3], contends that Keystone must be charged with knowledge that it would be subject to a UIM claim from Kristi Giordano. Keystone, it is asserted, knew all about this case as Gallagher's liability carrier, including the nature and extent of Kristi's injuries, that Velez bore the greater degree of liability and the least amount of coverage which had to be split among three claimants. Prudential also alleges that Keystone knew or ought to have known of its own policy limits and coverages, and similar information regarding Velez and Kristi. It further points out that Keystone consented to its own insured's proposed settlement with Velez and that it paid only a relatively small proportion ($6,000 or 10%) of Kristi's damages from its own *81 liability coverage. Armed with this knowledge, according to Prudential, Keystone could have reasonably intervened to delay settlement with Velez until the UIM situation was ironed out. Failing to do so, it cannot now be heard to complain that its subrogation rights against Velez have been released.
Keystone responds by arguing that it consented to the Velez settlement with Gallagher because it knew, based on his injuries, that its residual UIM exposure to him was minimal. It further argues that even with all its knowledge of the case, the fact remains that it was not given the specific chance before the Kristi settlement to protect its subrogation rights against Velez on her claim. Keystone's counsel, at oral argument, stated that the company regularly pursues and collects against the personal assets and income of insureds whose liability coverage has been exhausted.
These are difficult arguments. Nevertheless, in my opinion, the central point of the Longworth procedure is to give, at a critical moment, a UIM carrier the right to assess its own interests and make its own judgment as to how to protect them. In this case, Keystone was in fact prevented from doing so because of failure of due notice. Keystone's right of subrogation has thus been irrevocably prejudiced. This result must be laid at Prudential's doorstep in a logical extension of the Longworth procedure through its failure to timely notify Keystone of Kristi's proposed settlement and of its potential liability for her UIM benefits as primary carrier.
For the reasons stated, Prudential's motion is denied and that of Keystone to dismiss the case is granted.
NOTES
[1] Keystone's absence from the hearing is not, in my opinion, determinative of this case despite Keystone's argument to the contrary. It was immediately notified of the outcome of the arbitration and could have promptly moved the court to vacate the award and order a new hearing. Not having done so, it cannot now be heard to complain of the result.
[2] The Court further concludes that the case of Aubrey v. Harleysville Ins. Co., 140 N.J. 397, 658 A.2d 1246 (1995) does not alter the result reached in the cases cited in the text as it is distinguishable. It holds that a motorist with liability and UIM limits of $15/30 and who collects $40,000 from the tortfeasors is not "underinsured" within the meaning of N.J.S.A. 17:28-1.1.b., when one looks at the policy (limits $1.0 million, stepped-down for customers to the statutory minimum) issued to the auto dealer-owner of the car the motorist was driving at the time of the accident. Despite some general language that UIM coverage is "personal" to the insured and is linked to the insured not the vehicle, slip op. at 8, the case did not, in fact, deal with the primary/excess coverage issues raised by the case sub judice and, in my opinion, did not intend to raise doubts about the line of cases in the Appellate Division, which allows insurers the right to allocate inter se the risk of UIM coverage through "other insurance" policy provisions.
[3] The facts demonstrate, as indicated above, that the first notice Keystone received it might be liable for UIM benefits to Kristi was not until after the Velez settlement had been consummated.