432 So.2d 179 (1983)
Neal GALINKO, Appellant,
v.
AETNA CASUALTY AND SURETY CO., Appellee.
No. AN-89.
District Court of Appeal of Florida, First District.
May 25, 1983.
David R. Lewis, of Lewis, Paul, Isaac & Castillo, P.A., Jacksonville, for appellant.
Kathryn Collins Peek, of Howell, Howell, Liles, Braddock & Milton, Jacksonville, for appellee.
ZEHMER, Judge.
The plaintiff below, Neal Galinko, appeals a final judgment entered in a nonjury trial that denied him recovery of uninsured motorists benefits from his automobile insurance carrier, Aetna Casualty and Surety Co., because Galinko had, without Aetna's prior consent, settled with and released the tortfeasor who was liable for Galinko's injuries. The sole issue presented by the parties is whether certain policy provisions defeat, as a matter of law, Galinko's right to recover his uninsured motorist benefits even though the evidence shows that Aetna suffered no actual prejudice as a result of that settlement. The parties agree that North Carolina law applies, but no reported decision in that state has addressed this issue within the context of uninsured motorists coverage. We are persuaded that North Carolina would, in the circumstances of this case, permit the recovery in the absence of material prejudice.
On April 17, 1980, Galinko, a resident of North Carolina, was riding as a passenger in an automobile involved in a head-on collision in Jacksonville, Florida, caused by Joseph Tervail. Galinko and two other persons suffered serious injuries, and a fourth person was killed. Tervail, a serviceman, was "AWOL" at the time. He was unable to make bond when arrested and jailed on a charge of manslaughter, and was later convicted and imprisoned on that charge. Tervail had few apparent assets other than an assigned risk automobile liability insurance *180 policy in the amount of $10,000 each person, $20,000 each accident. Galinko had uninsured motorists coverage with Aetna in the amount of $25,000 each person, $50,000 each accident.
In view of the death and serious injuries resulting from the accident, the $10,000/$20,000 coverage afforded by Tervail's policy was quickly exhausted. In March 1981, without obtaining Aetna's written consent, Galinko settled for his share of the policy proceeds, $2,787.27, based on an apportionment with other claimants, and he gave Tervail and Tervail's insurer a complete release. Prior to this settlement, in August 1980, Galinko had made a claim for uninsured motorists benefits, but Aetna had denied coverage on the ground that Tervail was not an uninsured motorist under North Carolina law. It was not until September 1981 that Aetna learned of Galinko's settlement and release of Tervail.
In November 1981, Galinko filed suit against Aetna. At trial, Aetna conceded that Tervail was an uninsured motorist under North Carolina law, but continued to deny benefits, citing policy provisions that exclude uninsured motorists coverage where the insured, without Aetna's consent, has settled with anyone who may be legally liable for the bodily injuries, and citing the trust agreement provisions requiring the insured to protect Aetna's subrogation right to proceeds from any such settlement.[1] Galinko contended that such provisions would defeat his right of action for benefits only if Aetna was actually prejudiced by reason of the settlement. He introduced evidence that Aetna's attempt to enforce any subrogation rights against Tervail would not have produced funds in addition to the settlement amount and that Aetna was demonstrably not prejudiced by the settlement. At the conclusion of the nonjury trial, the court ruled as a matter of law that Galinko's settlement and release of Tervail "operated to destroy the defendant Aetna Casualty and Surety Company's right of subrogation set forth in its policy of insurance" and precluded plaintiff from maintaining an action "against Aetna on the policy for uninsured motorists benefits," citing Hilley v. Blue Ridge Insurance Co., 235 N.C. 544, 70 S.E.2d 570 (N.C. 1952).
In Hilley, the automobile owned by Hilley, the insured, was damaged on a railroad crossing when hit by a train. The Southern Railroad claimed that the car had been pushed onto the railroad crossing by a drunk driver who had borrowed the car from Hilley and that Hilley owed the railroad for damages to its engine. Southern pressed Hilley for payment, with assistance from the local police, so Hilley settled with the railroad for $157.50 and released any claim he had against the railroad for collision damages to his car. Thereafter, Hilley sought to collect for damages to his car under the collision coverage of his automobile policy with Blue Ridge Insurance Company. Blue Ridge declined to pay in view of the settlement and release of Southern, and litigation ensued. At trial, the jury returned special verdicts in which they *181 found that the release given did not prejudice the subrogation rights of the insurer. On appeal from a judgment against the insurer, the North Carolina Supreme Court, applying the "strict contractual approach" to construing and enforcing insurance policies, reversed and held that the insured's release of Southern before Blue Ridge paid the claim had, by operation of law, destroyed the insurance company's right of subrogation and, consequently, had destroyed Hilley's right of action for collision coverage.
Galinko argues that Hilley, a 1952 decision, is not controlling in the circumstances of this case because it involved collision insurance, not uninsured motorists coverage, and the North Carolina Supreme Court, by its recent decision in Great American Ins. Co. v. C.G. Tate Construction Co., 303 N.C. 387, 279 S.E.2d 769 (N.C. 1981), abandoned the traditional "strict contractual approach" to construction and enforcement of automobile insurance policies and adopted the modern, more liberal rule that an insured's noncompliance with certain policy provisions will not destroy his right of action for benefits under the policy in the absence of material prejudice to the insurer. Since the Tate case involved notice of accident provisions, we must examine its rationale to determine whether the principles there announced, rather than those in Hilley, should be applied to the uninsured motorists claim in the circumstances of this case.
In Tate, the insured neglected to notify its insurer, Great American, of an accident because its officials thought, based on statements from its employees, that it was not involved. Great American learned from third parties some 27 days after the accident, however, of a potential claim against the insured, Tate, that might be covered under the liability policy. Great American, therefore, filed suit for declaratory relief, seeking a judgment that it had no obligation to defend or indemnify Tate in any suit arising out of the accident because Tate had failed to notify Great American of the incident as soon as practicable in violation of the policy provisions. Applying prior North Carolina case law, which had followed traditional rules of strict enforcement of contract conditions, the trial court entered judgment holding that Great American was excused from liability. The litigation ultimately worked its way to the North Carolina Supreme Court, where, in affirming the intermediate appellate court's reversal of the judgment for Great American, the Supreme Court stated that the question to be decided was:
... whether to continue to apply traditional contract principles and hold that failure to comply strictly with this condition precedent releases the insurer from its obligation to defend and indemnify or to reject the traditional approach and embrace the modern view that this provision, although denominated by the policy as a condition precedent, should be construed in accord with its purpose and with the reasonable expectations of the parties. For the reasons discussed below, we adopt the modern view and construe this provision according to the reasonable expectations of the parties. Accordingly, we hold that an unexcused delay by the insured in giving notice to the insurer of an accident does not relieve the insurer of its obligation to defend and indemnify unless the delay operates materially to prejudice the insurer's ability to investigate and defend. (279 S.E.2d at 771)
Recognizing that for years North Carolina courts had traditionally employed the "strict contractual approach" to the construction of insurance policies and had ruled that breach of policy conditions would operate as a matter of law to excuse the insurance company from further obligation, the court took note that many courts had recently rejected the strict contractual approach and interpreted notice provisions in insurance contracts in accord with the reasonable expectations of the parties. The court cited its earlier decisions holding that only where an insured's breach of a policy provision requiring cooperation in the defense of an action caused material prejudice to the insurer would such breach excuse coverage and the insurer's obligation to defend,[2] *182 characterizing that decision as a "harbinger of the holding in this case" (279 S.E.2d at 773, n. 2.). The court reasoned that it would be unfair to insureds to find that coverage may be forfeited even though there is no likelihood that the insurance carrier may not be materially prejudiced by the breach because "insurance is an instrument of a social policy that the victims of negligence be compensated. To that end, companies are franchised to sell coverage. We should, therefore, be mindful also of the victims of accidental events in deciding whether a forfeiture should be upheld" (279 S.E.2d at 774). The court continued:
Rejection of the strict contractual approach means that the interpretation of the notice provision will be guided more by its purpose  the reason for its inclusion in the insurance contract  than by its seemingly conclusive terms. Additionally, adoption of the modern rule of reasonable expectations promotes the social function of insurance coverage: providing compensation for injuries sustained by innocent members of the public. The rule we adopt today has the advantages of promoting social policy and fulfilling the reasonable expectations of the purchaser while fully protecting the ability of the insurer to protect its own interest. (279 S.E.2d at 774)
The North Carolina Supreme Court further held the insurer should bear the burden of proving it has been materially prejudiced by the breach of the notice provision, but that any breach must first be shown by the insured to have been in good faith.
We believe that application of the strict holding in Hilley to the facts in this case is directly contrary to the modern, more liberal principles adopted in Tate for the construction and enforcement of insurance policy provisions regarding notice. The obvious purpose of the uninsured motorists exclusion and the trust agreement provisions relied on by Aetna in this case is to prevent an insured from settling and thereby releasing an uninsured tortfeasor in circumstances where that tortfeasor may be able realistically to pay from personal assets part or all of the damages to Aetna's insured. This undoubtedly is in accord with the reasonable expectations of Aetna and Galinko in this case. Florida courts have recognized that "there is an analogy between an exclusion clause in an uninsured motorist provision and a lack of notice provision in an ordinary liability policy,"[3] and that an insurer will not be excused from liability for uninsured motorists benefits under its policy pursuant to such exclusion clauses where a lack of prejudice is shown.[4] When an insurer claims prejudice from loss of its subrogation rights, lack of actual prejudice may be established by showing that the financial condition of the tortfeasor is such that no recovery by way of subrogation is realistically available.[5] This reasoning in our Florida cases is entirely consistent with the rationale in Tate.
In this case, Galinko introduced evidence that he settled for what he could get, because Tervail's only apparent asset was his liability insurance policy, so that Aetna was not in fact prejudiced by the settlement. The settlement was made without Aetna's consent at a time when Aetna was denying coverage on grounds that Tervail was not an uninsured motorist under the applicable North Carolina law.[6] Losing a right of subrogation against the Southern Railroad is a far cry from losing such right against Tervail. The trust agreement provisions relied on by Aetna required Galinko to do whatever was proper to secure Aetna's *183 rights and to do nothing after loss to prejudice such rights.[7] Aetna might well have argued that Galinko breached this provision had he not settled with Tervail's insurance carrier in time to avoid irrevocably losing those benefits by payment to the other injured persons.
The trial court's application of the strict rule in Hilley did not promote the "social policy that the victims of negligence be compensated," nor did it fulfill "the reasonable expectations of the purchaser while fully protecting the ability of the insurer to protect its own interest." Tate, supra, 279 S.E.2d at 774.
The court below erred in applying the wrong rule of law and failing to determine whether actual prejudice resulted to Aetna.[8] The judgment is reversed and the case is remanded for further proceedings consistent herewith.[9]
BOOTH and LARRY G. SMITH, JJ., concur.
NOTES
[1] Aetna relies on the following exclusion:

"This policy does not apply under the Uninsured Motorists coverage:
* * * * * *
(b) to bodily injury to an Insured with respect to which such Insured, his legal representative or any person entitled to payment under this coverage shall, without written consent of the Company, make any settlement with any person or organization who may be legally liable therefor."
Aetna also contends this provision must be read in conjunction with the policy provision entitled TRUST AGREEMENT, which provides in part:
In the event of payment to any person under the Uninsured Motorists Coverage:
(a) The company shall be entitled to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury because of which such payment is made;
(b) Such person shall hold in trust for the benefits of the Company all rights of recovery which he shall have against such other person or organization because of the damages which are the subject of claim made under this Coverage;
(c) such person shall do whatever is proper to secure and shall do nothing after loss to prejudice such rights... .
[2] Henderson v. Rochester American Ins. Co., 254 N.C. 329, 118 S.E.2d 885 (N.C. 1961).
[3] Bass v. Aetna Casualty and Surety Co., 199 So.2d 790, 792 (Fla. 4th DCA 1967), cert. den., 206 So.2d 211 (Fla. 1968).
[4] Ibid.; Kaplan v. Phoenix of Hartford Ins. Co., 215 So.2d 893 (Fla. 3d DCA 1968), cert. den., 220 So.2d 365 (Fla. 1969); Southeastern Fidelity Ins. Co. v. Earnest, 378 So.2d 787 (Fla. 3d DCA 1979); Tucker v. Seward, 400 So.2d 505 (Fla. 5th DCA 1981).
[5] Tucker v. Seward, supra, 400 So.2d at 506-07.
[6] The parties have not pleaded, and we do not address, whether Aetna's initial denial of coverage on this ground alone could estop it from relying on the exclusionary clause later on at the trial.
[7] See note 1, supra.
[8] While the North Carolina decision in Tate, supra, placed the burden of proof on the insurer, plaintiff Galinko in this case assumed the burden of proof in the court below, as would be his duty under the Florida decisions cited in note 4, supra. The parties did not address, and we do not decide, the conflict of laws question as to who should bear that burden in this case.
[9] Since other defenses were alleged by Aetna, but not reached in the first trial, it may well become necessary to consider those issues upon further proceedings.