978 P.2d 740

### Rosalina V. TAYLOR and Emilio I. Taylor, Plaintiffs-Appellants,

### v.

### GOVERNMENT EMPLOYEES INSURANCE COMPANY, Defendant–Appellee.

### No. 21227.

Supreme Court of Hawai'i.

May 5, 1999.

---

Thomas D. Collins, III, on the briefs, Honolulu, for the plaintiffs-appellants Rosalina V. and Emilio I. Taylor.

Kathy M. Sarria and Carleton B. Reid (of Reid, Richards & Miyagi), on the briefs, Honolulu, for the defendant-appellee Government Employees Insurance Company.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

Opinion of the Court by LEVINSON, J.

The plaintiffs-appellants Rosalina V. Taylor (Rosalina) and Emilio I. Taylor (collectively, the Taylors) appeal from the first circuit court's judgment and order denying their motion for summary judgment and granting the cross-motion of the defendant-appellee Government Employees Insurance Company (GEICO) for summary judgment. On appeal, the Taylors contend that (1) the consent-to-settle clause in their underinsured motorist (UIM) policy is void as against public policy and (2) GEICO's refusal to consent to a settlement in an amount only $2000.00 less than the tortfeasor's liability coverage limits was unreasonable. Because, on the present record, GEICO's refusal to consent to the settlement was unreasonable, we vacate the judgment appealed from and remand this matter to the circuit court for the entry of an order granting the Taylors' motion for summary judgment.

## I. *BACKGROUND*

At all times relevant to the present matter, the Taylors were insured by an automobile insurance policy, issued by GEICO, which included UIM coverage. On September 26, 1993, Rosalina was injured in a collision with a vehicle driven by Mary McKaig, who was insured at that time by State Farm Mutual Automobile Insurance Company (State Farm).[1] As a result of the injuries that she sustained in the accident, Rosalina incurred medical expenses totaling $15,196.56. Also as a result of the accident, Rosalina was given a medical discharge from the United States Navy following thirteen years and nine months of continuous service. The Taylors' economist estimated that the concomitant loss of future earnings and benefits resulted in an economic loss to Rosalina of $584,116.00.

On January 17, 1996, the Taylors filed a civil action against McKaig. On May 1, 1996, the Taylors' attorney informed GEICO by letter that State Farm had offered to settle the Taylors' claim. The letter stated in relevant part:

An offer has been made to settle this case for $33,000.00 subject to the approval of my client and your company as UIM carrier. The policy limits are $35,000.00.

... I also need any provisions that GEICO intends to rely on to claim UIM coverage would not apply until the BI limits are exhausted.

Finally, many insurance policies require written permission to settle the bodily injury claim as a condition of making a UIM claim. Accordingly, please provide written permission by your own letter or by signing below and faxing this letter back to my office.

GEICO's claims examiner responded by letter dated May 7, 1996, stating in relevant part:

Please be advised that we will not grant concurrence with regard to the UIM claim and your underlying BI settlement *as you have not obtained the bodily injury policy limits of the BI carrier*. As you are aware[,] under the terms of the UIM coverage[,] you must obtain all collectible bodily injury coverage before you may present a UIM claim.

(Emphasis added.)

The relevant UIM provisions of GEICO's auto insurance policy are as follows:

We will pay damages an *insured* is legally entitled to recover for *bodily injury* caused by accident and arising out of the ownership, maintenance or use of an *underinsured motor vehicle*. However, we will not pay until the total of all bodily injury liability insurance available has been exhausted by payment of judgments or settlements.

. . . .

EXCLUSIONS

1. This coverage does not apply to *bodily injury* to an *insured* if the *insured* or his legal representative has made a settlement or has been awarded a judgment of his claim without our prior written consent.

---

1. The record on appeal does not include McKaig's policy with State Farm.

. . . .

ARBITRATION

If any *insured* making claim under this policy and we do not agree that he is legally entitled to recover damages under this coverage from the owner or operator of an *underinsured motor vehicle* because of *bodily injury* to the *insured,* or do not agree as to the amount payable, either party may request arbitration.

(Emphases in original.) "Underinsured motor vehicle" is defined by the policy as

a motor vehicle with respect to the ownership, maintenance or use of which the sum of the limits of liability *under all bodily injury liability insurance coverage applicable at the time of loss to which coverage afforded by such policy or policies applies* is less than the liability for damages imposed by law.

(Emphasis added.)

On May 31, 1996, although GEICO refused to approve the proposed settlement, the Taylors executed a joint tortfeasor release and indemnity agreement that released McKaig and her insurers from liability for the September 26 accident in exchange for the $33,000.00. When GEICO subsequently refused the Taylors' demand for UIM benefits based upon the above-quoted policy provisions, the Taylors filed a complaint for declaratory relief in the circuit court, seeking (1) a declaration that they were entitled to UIM benefits under the policy and (2) an order compelling arbitration in order to determine the amount of UIM benefits due.

On April 7, 1997, the Taylors filed a motion for summary judgment alleging that GEICO (1) had been provided notice of the proposed settlement, (2) had unreasonably refused to consent to it, and, therefore, (3) had waived its right to rely upon the consent-to-settle clause and to be subrogated to the rights of its insured. On April 8, 1997, GEICO filed a cross-motion for summary judgment, contending that (1) the policy provisions in question were enforceable and (2) inasmuch as they had failed to exhaust McKaig's liability policy, the Taylors were precluded from recovering UIM benefits under the GEICO policy. On May 1, 1997, the circuit court entered an order denying the Taylors' motion for summary judgment and granting GEICO's cross-motion. On December 10, 1997, judgment was entered in favor of GEICO and against the Taylors. This timely appeal followed.

## II. STANDARDS OF REVIEW

### A. Motion For Summary Judgment

We review [a] circuit court's award of summary judgment *de novo* under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated:

[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Id.* (citations and internal quotation marks omitted); *see* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.,* 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

*Konno v. County of Hawai'i,* 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997) (quoting *Dunlea v. Dappen,* 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996)) (brackets in original). "The evidence must be viewed in the light most favorable to the non-moving party." *State ex rel. Bronster v. Yoshina,* 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citing *Maguire v. Hilton Hotels Corp.,* 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). In other words, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion]." *Maguire,* 79 Hawai'i at 112, 899 P.2d at 395 (citation omitted).

*State Farm Mut. Auto. Ins. Co. v. Murata,* 88 Hawaiʻi 284, 287–88, 965 P.2d 1284, 1287–88 (1998) (quoting *Estate of Doe v. Paul Revere Ins. Group,* 86 Hawaiʻi 262, 269–70, 948 P.2d 1103, 1110–11 (1997)) (brackets in original).

### B. *Interpretation Of A Statute*

"[T]he interpretation of a statute ... is a question of law reviewable *de novo.*" *State v. Arceo,* 84 Hawaiʻi 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara,* 81 Hawaiʻi 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura,* 80 Hawaiʻi 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa,* 79 Hawaiʻi 1, 3, 897 P.2d 928, 930, *reconsideration denied,* 79 Hawaiʻi 341, 902 P.2d 976 (1995); *State v. Nakata,* 76 Hawaiʻi 360, 365, 878 P.2d 699, 704, *reconsideration denied,* 76 Hawaiʻi 453, 879 P.2d 558 (1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Director of the Court,* 84 Hawaiʻi 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto,* 84 Hawaiʻi 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One ave-nue is the use of legislative history as an interpretive tool.

*Gray,* 84 Hawaiʻi at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawaiʻi 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*Ho v. Leftwich,* 88 Hawaiʻi 251, 256–57, 965 P.2d 793, 798–99 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawaiʻi 217, 229–30, 953 P.2d 1315, 1327–28 (1998)).

### III. *DISCUSSION*

We begin our analysis with the observation that " '... insurers have the same rights as individuals to limit their liability[ ] and to impose whatever conditions they please on their obligations, provided they are not in contravention of statutory inhibitions or public policy.' " *First Ins. Co. of Hawaiʻi, Inc. v. State,* 66 Haw. 413, 423, 665 P.2d 648, 655 (1983) (quoting 6B Appleman, *Insurance Law and Practice* § 4255, at 40 (1979).... As such, "[insurance] policies are subject to the general rules of contract construction; the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended[.]" *Id.* at 423–24, 665 P.2d at 655 (citations omitted). Moreover, "[every] insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy[.]" ... [ ]HRS[ ] § 431:10–237 [ (1993) ]; *see State Farm Mut. Auto. Ins. Co. v. Fermahin,* 73 Haw. 552, 556, 836 P.2d 1074, 1077 (1992); *Smith v. New England Mutual Life Ins. Co.,* 72 Haw. 531, 534, 827 P.2d 635, 636 (1992).

Nevertheless, adherence to the plain language and literal meaning of insurance contract provisions is not without limitation. We have acknowledged that "[b]ecause insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, we have long subscribed to the principle that they must be construed liberally in favor of the insured and [any] ambiguities [must be] resolved against the insurer." *Sturla, Inc. v. Fireman's Fund Ins. Co.,* 67 Haw. 203, 209, 684 P.2d 960, 964 (1984) (citations and internal quotation marks omitted) (cited with approval in *Fermahin,* 73 Haw. at 556, 836 P.2d at 1077). "Put another way, the rule is that policies are to be construed in accord with the reasonable expectations of a layperson." *Id.* In addition, "[insurance] policies are governed by statutory requirements in force and effect at the time such policies are written.... Such provisions are read into each policy issued hereunder[ ] and become a part of the contract with full binding effect on each party." *AIG Hawaii Ins. Co., Inc. v. Estate of Caraang,* 74 Haw. 620, 633, 851 P.2d 321, 328 (1993) (citations and internal quotation marks omitted). Consequently, "[w]hen the terms of an insurance contract are in conflict with statutory language, the statute must take precedence over the terms of the contract." *Sol [v. AIG Hawaii Ins. Co.],* 76 Hawai'i 304,] 307, 875 P.2d [921,] 924[, *reconsideration denied,* 76 Hawai'i 353, 877 P.2d 890 (1994) ]; *see also Methven–Abreu v. Hawaiian Ins. & Guar.*

*Co. Ltd.,* 73 Haw. 385, 395–96, 834 P.2d 279, 285, *reconsideration denied,* 73 Haw. 625, 838 P.2d 860 (1992); [*National Union Fire Ins. Co. v.] Olson,* 69 Haw. 559,] 563–64, 751 P.2d 666, 669 (1988); *Walton v. State Farm Mut. Auto. Ins. Co.,* 55 Haw. 326, 328, 518 P.2d 1399, 1400–01 (1974); *Columbia Casualty Co. v. Hoohuli,* 50 Haw. 212, 214–15, 437 P.2d 99, 102 (1968). *Estate of Doe,* 86 Hawai'i at 271, 948 P.2d at 1112 (quoting *Dawes v. First Ins. Co. of Hawai'i, Ltd.,* 77 Hawai'i 117, 121–22, 883 P.2d 38, 42–43, *reconsideration denied,* 77 Hawai'i 489, 889 P.2d 66 (1994) (some brackets and ellipsis points added and some in original) (footnote omitted)).

■ The current UIM statute, HRS § 431:10C–301 (1993 & Supp.1998),[2] had its genesis in the 1985 legislative session as Senate Bill No. 389, which was intended to "provide a new optional 'underinsured' motorist coverage under [the] no-fault law" and thereby further "the overall intent of the no-fault law to provide speedy and adequate protection to persons injured in motor vehicle accidents at the least possible cost." Sen. Stand. Comm. Rep. No. 689, in 1985 Senate Journal, at 1181. The bill's provisions were eventually incorporated into House Bill No. 557, *see* Sen. Stand. Comm. Rep. No. 915, in 1985 Senate Journal, at 1302, enacted into law as Act 181, and codified as HRS §§ 431–448(b) and (c) (1985).[3] When the Hawai'i Insurance Law, HRS ch. 431 (1985), was recodified in 1987, *see* 1987 Haw. Sess. L. (Vol.2) Act 347, §§ 1–4, at 1–342, the provisions of HRS § 431–448 became part of HRS § 431:10C–

2. HRS § 431:10C–301(b)(4) provides in relevant part that "[a] motor vehicle insurance policy shall include ... [c]overage for loss resulting from bodily injury or death suffered by any person legally entitled to recover damages from owners or operators of underinsured motor vehicles." The term "underinsured motor vehicle" means "a motor vehicle with respect to the ownership, maintenance, or use for which sum of the limits of *all bodily injury liability insurance coverage* and self-insurance *applicable at the time of loss* is less than the liability for damages imposed by law." HRS § 431:10C–103 (1993 and Supp. 1998) (emphases added).

3. HRS § 431–448 provided in relevant part:
 **Automobile liability; coverage for damage by uninsured or underinsured motor vehicle.** . . .

(b) Each insurer shall offer to each policyholder or applicant for a motor vehicle liability policy optional additional insurance coverage for loss resulting from bodily injury or death suffered by any person legally entitled to recover damages from owners or operators of underinsured motor vehicles.

(c) The term "underinsured motor vehicle," as used in this section, means a motor vehicle with respect to the ownership, maintenance or use of which the sum of the limits of liability of all bodily injury liability insurance coverage applicable at the time of loss to which coverage afforded by such policy or policies applies is less than the liability for damages imposed by law.

302, captioned "Required optional additional insurance." HRS Title 24 (1987 Spec. Pamphlet) at 186. The UIM law achieved its substantially current form in 1988, when it was removed from HRS § 431:10C–302 and incorporated into HRS § 431:10C–301, captioned "Required motor vehicle policy coverage." The 1988 amendments to HRS § 431:10C–301 mandated that UIM coverage be included in all no-fault auto insurance policies sold in Hawai'i unless the insured rejected such coverage in writing. *See* Hse. Stand. Comm. Rep. No. 1150–88, in 1988 House Journal, at 1248; Sen. Stand. Comm. Rep. No. 215, in 1988 Senate Journal, at 675. In its report on the proposed amendments, the House Committee on Consumer Protection and Commerce noted:

> The purpose of this bill is to require insurers to offer coverage for underinsured motor vehicles in motor vehicle insurance policies. Underinsured motorist coverage would then be treated in the same manner that uninsured motorist coverage is presently treated, i.e., to provide protection, through voluntary insurance, for persons who are injured by underinsured motorists whose liability polic[i]es are inadequate to pay for personal injuries caused by motor vehicle accidents....
>
> ....
>
> Your committee received testimony in favor of this bill, but there were concerns expressed that insureds were not being offered underinsured motorist coverage by certain insurers. To alleviate the problem it was suggested that the bill should provide that, unless the named insured rejects the coverage in writing, the additional underinsured motorist coverage will be included in the policy. You committee has, accordingly, amended the bill to provide for the written rejection by the insured in the same manner as is presently required for uninsured motorist coverage.

Hse. Stand. Comm. Rep. No. 1150–88, at 1248. Thus, like the uninsured motorist statutes, HRS § 431:10C–301(b)(4) is a remedial statute that must be liberally construed "in order to accomplish the purpose for which [it] was enacted.... [Remedial] statutes are liberally construed to suppress the [perceived] evil and advance the [enacted] remedy." *See Estate of Doe,* 86 Hawai'i at 273, 948 P.2d at 1114 (quoting *Dawes,* 77 Hawai'i at 122–23, 883 P.2d at 43–44) (some brackets in original and some added) (internal quotation signals omitted).

Our review of the language and the legislative history of the UIM statute does not reveal an express legislative intent to permit or prohibit the use of "consent-to-settle" and "exhaustion of benefits" clauses to preclude recovery by insureds who present claims that would otherwise be compensable pursuant to the provisions of their UIM coverage. Furthermore, the question has never before been addressed by a Hawai'i appellate court.[4]

The validity of consent-to-settle provisions has been widely litigated outside of Hawai'i, and a majority of jurisdictions has upheld such provisions in the UIM context. *See, e.g., Allstate Ins. Co. v. Beavers,* 611 So.2d 348 (Ala.1992); *Estate of Harry v. Hawkeye–Security Ins. Co.,* 972 P.2d 279 (Colo.Ct.App. 1998); *Tate v. Secura Ins.,* 587 N.E.2d 665 (Ind.1992); *Kapadia v. Preferred Risk Mutual Ins. Co.,* 418 N.W.2d 848 (Iowa 1988); *Greenvall v. Maine Mut. Fire Ins. Co.,* 715 A.2d 949 (Me.1998); *Lee v. Auto–Owners Ins. Co.,* 218 Mich.App. 672, 554 N.W.2d 610 (1996); *Aetna Cas. & Sur. Co. v. Westerkamp,* 603 A.2d 308 (R.I.1992); *Rutherford v. Tennessee Farmers Mut. Ins. Co.,* 608 S.W.2d 843 (Tenn.1980); *Miller v. Hanover Ins. Co.,* 718 S.W.2d 429 (Tex.Ct.App.1986); *Kronjaeger v. Buckeye Union Ins. Co.,* 200 W.Va. 570, 490 S.E.2d 657 (1997); *see also* 8D John A. Appleman and Jean Appleman, *Insurance Law and Practice* § 5132, at 225 (1981 and Supp.1998); 12A Ronald A. Anderson and Mark S. Rhodes, *Couch on Insurance,* § 45:645, at 186 (2d ed.1981 and Supp.1997); *cf. Bantz v. Mutual of Enumclaw Ins. Co.,* 124 Idaho 780, 864 P.2d 618 (1993) (finding consent-to-settle clauses valid in the uninsured motorist (UM) context);

---

**4.** This court *has* upheld the validity of a consent-to-sue provision in an uninsured motorist policy. *See Moorcroft v. First Ins. Co. of Hawaii, Ltd.,* 68 Haw. 501, 720 P.2d 178 (1986). Inasmuch as the provision in *Moorcroft* did not require the forfeiture of benefits under the policy if the insured failed to obtain the insurer's consent, however, it is inapposite to the present case.

*Stevens v. Merchants Mut. Ins. Co.*, 135 N.H. 26, 599 A.2d 490 (1991) (upholding UM consent-to-settle clauses).

The Taylors argue that upholding consent-to-settle provisions would conflict with the legislative intent underlying HRS § 431:10C–301(b)(4). Indeed, the relatively few jurisdictions that have voided consent-to-settle provisions have done so on the grounds that, in the UIM context, such provisions "frustrate[ ] the legitimate purpose of providing maximum and expeditious protection to the innocent victims of financially irresponsible motorists." *Longworth v. Van Houten,* 223 N.J.Super. 174, 538 A.2d 414, 419 (App.Div. 1988) (concluding that consent-to-settle clauses contravene public policy); *see also Schmidt v. Clothier,* 338 N.W.2d 256 (Minn. 1983) (holding consent-to-settle clauses invalid); *Elovich v. Nationwide Ins. Co.,* 104 Wash.2d 543, 707 P.2d 1319 (1985) (holding that consent-to-settle clauses are contrary to public policy); *cf. Dairyland Ins. Co. v. Lopez,* 22 Ariz.App. 309, 526 P.2d 1264 (1974) (holding that consent-to-settle clauses are void in the UM context because, pursuant to statute, UM coverage is mandatory); *Muir v. Hartford Accident and Indem. Co.,* 147 Vt. 590, 522 A.2d 236 (1987) (holding that consent-to-settle clauses contravene UM statute).

■ Nevertheless, we are unable to hold that consent-to-settle clauses, per se, contravene the intent of HRS § 431:10C–301(b)(4). The UIM statute does not mandate that coverage be unqualified. Rather, HRS § 431:10C–301(b)(4) provides merely that such insurance cover "loss from bodily injury or death." The legislative history of the UIM statute speaks of the "speedy and adequate protection" of the injured insured "at the least possible cost." *See* Sen. Stand. Comm. Rep. No. 689, in 1985 Senate Journal, at 1181; *Kaiama v. AIG Hawai'i Ins. Co., Inc.,* 84 Hawai'i 133, 135, 930 P.2d 1352, 1354 (1997). In our view, consent-to-settle provisions do not necessarily violate either the letter or the spirit of HRS § 431:10C–301(b)(4).

■ A consent-to-settle provision does not, however, give a UIM insurance carrier carte blanche to deny UIM benefits to an insured victim.[5] Indeed, UIM coverage would be rendered patently illusory if UIM carriers were free routinely to deny UIM benefits by means of sweeping exclusionary provisions. The stated purpose of HRS § 431:10C–301(b)(4)—the protection of insured victims—would be frustrated if a UIM carrier could block potential settlements through the arbitrary invocation of consent-to-settle provisions. *Cf. Sylvester v. Animal Emergency Clinic of Oahu,* 72 Haw. 560, 566, 825 P.2d 1053, 1056 (1992) (acknowledging that "the law favors the resolution of controversies through compromise or settlement rather than by litigation"). This court has recognized that an insurer is subject to a legal duty to "act in good faith in dealing with its insured[.]" *Delmonte v. State Farm Fire and Cas. Co.,* 90 Hawai'i 39, 54 n. 13, 975 P.2d 1159, 1174 n. 13 (1999); *Best Place, Inc. v. Penn America Ins. Co.,* 82 Hawai'i 120, 132, 920 P.2d 334, 346 (1996). Accordingly, we hold that a UIM carrier's grounds for denying UIM benefits under a consent-to-settle provision in a UIM policy must be *reasonable,* in good faith, and within the bounds of the intent underlying HRS § 431:10C–301(b)(4). *See, e.g., Prudential Property & Cas. Ins. Co. v. Nayerahamadi,* 593 F.Supp. 216, 218 (E.D.Pa.1984) (holding that "[a]n insurer may not use [a consent-to-settle] clause to block settlement *unreasonably* " (emphasis added)); *Tegtmeyer v. Snellen,* 791 S.W.2d 737, 740 (Mo.Ct.App.1990) (recognizing that consent-to-settle provisions will "generally be upheld unless consent is *unreasonably* withheld" (internal quotation signals and citation omitted) (emphasis added)); *Sexton v. Continental Cas. Co.,* 816 P.2d 1135, 1137 (Okla.1991) (holding that "when an insurer *arbitrarily* withholds consent[,] such action constitutes a waiver" (emphasis added)).

---

5. We note that consent-to-settle provisions are triggered only if the insured party intends to claim UIM benefits. Moreover, a breach of the provision affects no more than the insured's entitlement to such benefits. Accordingly, an insured party who does not file a claim under his or her UIM policy is under no obligation to obtain the consent of his or her UIM insurer as a precondition to a settlement with the relevant tortfeasor or tortfeasors.

In this regard, we agree with GEICO that the protection of the UIM carrier's subrogation rights would be a reasonable basis for a refusal to consent to settlement. This court has defined subrogation as "'the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt.'" *Shimabuku v. Montgomery Elevator Co.*, 79 Hawai'i 352, 358, 903 P.2d 48, 54 (1995) (holding that a release could not extinguish an employer's statutory lien and subrogation rights, created in the workers' compensation context pursuant to HRS § 386–8, without employer's consent) (quoting *Peters v. Weatherwax*, 69 Haw. 21, 27, 731 P.2d 157, 161 (1987)). In the UIM context, once the UIM carrier has paid benefits to the injured insured, the UIM carrier succeeds to the insured's rights against the tortfeasor. The UIM carrier may then prosecute the insured's claim against the tortfeasor, to the extent of the UIM carrier's payments to the insured. Thus, where a tortfeasor has sufficient assets to offset his or her lack of insurance, the UIM carrier may recoup its payments to the insured victim. Consent-to-settle provisions perform the crucial function of protecting a UIM carrier's potential subrogation interests:

> [A]s a practical matter, the victim can only settle with the underinsured tortfeasor by giving him a general release. This is so since the tortfeasor's insurer, which controls settlement negotiations and any litigation against the tortfeasor as well as the pocketbook (up to the policy limits), owes a duty to its own insured, the tortfeasor, to provide him with the protection of a general release as a condition of settlement.[6] But since the giving of a release by the victim extinguishes any further right the victim might have against the tortfeasor, it also extinguishes the UIM carrier's right of subrogation against the tortfeasor, that right being no greater than the victim's own remaining right against the tortfeasor. *See Montefusco Excavating & Contracting Co. v. Middlesex Cty.*, 82 N.J. 519, 523, 414

A.2d 961 (1980). Thus, *the sole function of the consent-to-settle clause is the preservation of the subrogation right.*

*Longworth*, 538 A.2d at 419 (emphasis added); *see also Miller*, 718 S.W.2d at 430 (noting that "the purpose of the [consent-to-settle provision] is to protect the insurance company's subrogation rights").

The preservation of a UIM carrier's subrogation rights is consistent with the interests of this state's public policy. HRS § 431–448(b), the immediate precursor to HRS § 431:10C–301(b)(4), mandated that insurers offer UIM coverage at "a relatively modest increase in premium." *Mollena v. Fireman's Fund Ins. Co. of Hawaii, Inc.*, 72 Haw. 314, 320, 816 P.2d 968, 971 (1991); *see also* Sen. Stand. Comm. Rep. No. 689, in 1985 Senate Journal, at 1181 (providing that "the overall intent of the no-fault law [is] to provide speedy and adequate protection to persons injured in motor vehicle accidents *at the least possible cost*" (emphasis added)). The continued recognition of UIM insurers' right of subrogation will tend to foster the foregoing "overall" legislative intent by facilitating the maintenance of modestly priced UIM coverage, inasmuch as UIM carriers will, at least to some degree, be in a position to recoup their UIM payments to their insureds from the responsible tortfeasors. In this general connection, we have already noted that "[e]quitable principles dictate that the subrogee exercise reasonable diligence to protect its subrogation interest." *Grain Dealers Mut. Ins. Co. v. Pacific Ins. Co., Ltd.*, 70 Haw. 211, 217, 768 P.2d 226, 230 (1989). Accordingly, it is reasonable for a UIM insurance carrier to employ a consent-to-settle clause as a vehicle for the protection of its subrogation rights. We agree with the Supreme Court of New Mexico in recognizing that the UM/UIM statutory scheme is

> designed to protect the insured from the uninsured or underinsured motorist, not to protect the insurance company from its own insured. *Sandoval v. Valdez*, 91 N.M. 705, 580 P.2d 131 (Ct.App.1978). However, "[c]onstruing an insurance contract ac-

---

**6.** *But see* the discussion *infra* regarding the prerogative of a tortfeasor's insurer to provide a limited release.

curately and giving it the effect which its language clearly commands is not *ipso facto* a breach of public policy merely because it disappoints the victim of an uninsured motorist." *Tuthill v. State Farm Insurance Co.*, 19 Ill.App.3d 491, 498, 311 N.E.2d 770, 776 (1974) (citation omitted). In response to the insured's argument in *Tuthill* that the consent provision in effect gives the insurer the power to control litigation by forcing the insured to proceed to trial when the insurer refuses to consent to a settlement, the court noted that the consent provision is not designed to control the insured's access to the courts, but rather to protect the insurer's subrogation rights. *Id.* at 497, 311 N.E.2d at 775. Moreover, the court pointed out that the insured is protected by the generally-accepted notion that *an insurer's arbitrary and unreasonable withholding of consent would constitute a waiver of the consent requirement.*

*March v. Mountain States Mut. Cas. Co.*, 101 N.M. 689, 687 P.2d 1040, 1044 (1984) (brackets in original) (emphasis added).

 A UIM carrier may not simply block settlement, however, on the unsupported assertion that it is doing so in order to protect its subrogation interests. We adopt the view, held by many courts, that the legitimate invocation of a consent-to-settle provision "requires the insurer to demonstrate prejudice from the insured's failure to obtain the insurer's consent before settling with the tortfeasor." *Greenvall*, 715 A.2d at 954; *see also Galinko v. Aetna Cas. and Sur. Co.*, 432 So.2d 179 (Fla.Dist.Ct.App.1983); *MacInnis v. Aetna Life & Cas. Co.*, 403 Mass. 220, 526 N.E.2d 1255 (App.Ct.1988); *Sorensen v. Farmers Ins. Exch.*, 279 Mont. 291, 927 P.2d 1002 (1996). Inasmuch as an insurer must

act in good faith toward its insured, *see Delmonte*, 90 Hawai'i at 54 n. 13, 975 P.2d at 1174 n. 13; *Best Place*, 82 Hawai'i at 132, 920 P.2d at 346, a UIM carrier must have a reasonable basis for its assertion that it is denying settlement based on the preservation of its subrogation interests. "If the carrier denies the claim of its insured *without a good faith investigation* into its merits, or if the carrier does not conduct its investigation in a reasonable time," *Beavers*, 611 So.2d at 351 (citation omitted) (emphasis added), the carrier may not deny UIM benefits to its insured. In order to demonstrate prejudice, the UIM carrier's investigation should address factors such as "the amount of assets held by the tortfeasor, the likelihood of recovery via subrogation, and the expenses and risks of litigating the insured's cause of action." *Gibson v. State Farm Mut. Auto. Ins. Co.*, 123 Ohio App.3d 216, 704 N.E.2d 1, 6 (1997).

 One theoretical stumbling block generated by consent-to-settle provisions is a tortfeasor's liability insurer's potential hesitation, by virtue of the insurer's duty of good faith, to accept a settlement that does not generally release the tortfeasor.[7] Like the victim's UIM carrier, the tortfeasor's liability insurer is, of course, subject to a duty of good faith toward its insured at all stages of a claim, including settlement negotiations. *See Best Place*, 82 Hawai'i at 132, 920 P.2d at 346 (holding that "there is a legal duty, implied in a first- and *third-party insurance contract*, that the insurer must act in good faith in dealing with its insured" (emphasis added)). In order to encourage settlement, *see Sylvester, supra*, we now hold that an underinsured tortfeasor's automobile insurance carrier[8] discharges its duty to indemnify its insured when, as a condition of a good

---

7. The tortfeasor's liability policy, by its terms, usually accords the insurer the prerogative to settle the plaintiff's claims against the tortfeasor in the amount of the liability insurance policy limit, with or without the tortfeasor's consent. *See* Robert H. Jerry, II, *Understanding Insurance Law* 763 (2d ed.1996) (noting that "the typical language reserves to the insurer a privilege to settle, or not to settle, as the insurer in the exercise of its discretion sees fit"); *see also* 7C Appleman, *Insurance Law and Practice* § 4711, at 369 (stating that "[l]iability insurance contracts have been held to give the insurer absolute

authority to settle claims within the policy limits, and the insured has no power either to compel the insurer to make such settlements, or to prevent it from doing so").

8. Of course, the conduct of the attorney retained by the tortfeasor's liability carrier to represent the tortfeasor should be guided by the interests of his or her client. *See Finley v. Home Ins. Co.*, 90 Hawai'i 25, 33–35, 975 P.2d 1145, 1153–55 (1998) (approving the proposition that "while the insurer may have a contractual right to select defense counsel, the insurer's desire to limit ex-

faith settlement, it provides its insured with the protection of an agreement in which the victim releases the tortfeasor from all personal claims but preserves the UIM carrier's right of subrogation.[9]

██ Although we affirm the validity of consent-to-settle clauses in UIM policies when employed in good faith to preserve the UIM carrier's subrogation interests, we hold that exhaustion clauses are void as against public policy. Many jurisdictions have concluded that a UIM insurer cannot require that its insured exhaust the tortfeasor's insurance prior to applying for UIM benefits. *See New Hampshire Ins. Co. v. Knight,* 506 So.2d 75 (Fla.Dist.Ct.App.1987); *Mulholland*

*v. State Farm Mut. Ins. Co.,* 171 Ill.App.3d 600, 122 Ill.Dec. 657, 527 N.E.2d 29 (1988); *Brown v. USAA Cas. Ins. Co.,* 17 Kan.App.2d 547, 840 P.2d 1203 (1992); *Schmidt, supra; Mann v. Farmers Ins. Exch.,* 108 Nev. 648, 836 P.2d 620 (1992); *Longworth, supra; Buzzard v. Farmers Ins. Co., Inc.,* 824 P.2d 1105 (Okla.1991); *Sorber v. American Motorists Ins. Co.,* 451 Pa.Super. 507, 680 A.2d 881 (1996); *Olivas v. State Farm Mut. Auto. Ins. Co.,* 850 S.W.2d 564 (Tex.App.1993); *see also* 3 Alan I. Widiss, *Uninsured and Underinsured Motorist Insurance,* § 44.2, at 357–359 (2d ed. 1995 & Supp.1998). We agree with the following reasoning of the *Longworth* court:

pense must yield to the attorney's professional judgment and his or her responsibility to provide competent, ethical representation to the insured," as governed by the Hawai'i Rules of Professional Conduct).

9. We note that once a tortfeasor's liability insurer has discharged its duty to indemnify through a payment of policy limits, its duty to defend may be implicated. "The insurer's duty to defend its insured is contractual in nature and this court must look to the language of the particular policy involved to determine the scope of that duty." *Commerce & Industry Ins. Co. v. Bank of Hawaii,* 73 Haw. 322, 325, 832 P.2d 733, 735 (1992). Accordingly, the question whether an insurance company's duty to defend is discharged by a payment of policy limits can only be addressed in the context of the relevant insurance policy.

Some insurance policies provide that the insurer will defend *any suit,* even if groundless, that states claims implicating the coverage afforded by the policy. The majority of jurisdictions hold that, under such a policy, the duty to defend will survive a payment of policy limits. *See, e.g., American Cas. Co. of Reading v. Howard,* 187 F.2d 322, 326 (4th Cir.1951) (holding that, where the contract provided for the defense of any suit, duty to defend was not coextensive with duty to indemnify); *Liberty Mut. Ins. Co. v. Pacific Indem. Co.,* 557 F.Supp. 986, 988 (W.D.Pa.1983) (holding that, inasmuch as the language of the policy at issue was unambiguous, the duty of the insurer "to defend any suit against its insured survives the exhaustion of the policy's liability limits").

On the other hand, some insurance policies include provisions to the effect that the insurer's duty to defend is extinguished when the insurer's limit of liability for the coverage has been "paid" or "exhausted." The jurisdictions are split as to the legal import of such provisions on an insurer's duty to defend once it has paid policy limits. Some jurisdictions have held that, under such a provision, an insurer's duty to defend terminates upon a good faith payment of policy limits. *See Johnson v. Continental Ins. Cos.,* 202 Cal.App.3d

477, 248 Cal.Rptr. 412, 416–417 (1988) (holding that, where policy language was "unambiguous, clear, explicit, and conspicuous[,]" good faith payment of policy limits discharged insurer's duty to defend); *Simmons v. Farmers Ins. Group,* 877 P.2d 1255, 1258–1259 (Utah Ct.App.1994) (holding that, where payments were made in good faith, duty to defend ended with payment of policy limits). Other jurisdictions have held that, under such a policy provision, the payment of policy limits will not suffice to discharge an insurer's duty to defend unless the payment is made pursuant to settlement or judgment. *See Samply v. Integrity Ins. Co.,* 476 So.2d 79, 83 (Ala.1985) (holding that "an insurer is relieved of its duty to defend only upon exhaustion of its policy limits by settlement or judgment" and that tender of policy limits to clerk of court was insufficient); *Continental Ins. Co. v. Burr,* 706 A.2d 499, 501 (Del.1997) (holding that "the duty to defend is not discharged until policy limits are paid to settle all claims or to satisfy a judgment against the insured"); *Brown v. Lumbermens Mut. Cas. Co.,* 326 N.C. 387, 390 S.E.2d 150, 154 (1990) (holding that "the insurer's duty to defend continues until its coverage limits have been exhausted in the settlement of a claim or claims against the insured or until judgment against the insured is reached"); *Farmers Ins. Co. of Washington v. Romas,* 88 Wash.App. 801, 947 P.2d 754, 758 (1997), *review denied,* 135 Wash.2d 1007, 959 P.2d 125 (1998) (noting that the "avoidance of the duty to defend depends on whether a judgment or settlement has been reached with the injured party or the permission of the insured has been obtained to forego the duty to defend.").

As indicated previously, McKaig's liability policy with State Farm is not included on appeal. In the absence of relevant policy language, we deem it imprudent to take a definitive position at this time regarding an insurer's duty to defend subsequent to a tender of policy limits. Accordingly, we leave the resolution of that question for another day.

The exhaustion clause requires that the insured settle with or obtain judgment against the tortfeasor in the full amount of the tortfeasor's own liability coverage before the UIM carrier has any payment obligations at all under the UIM coverage. The adverse impact of this clause on the legislative purpose in providing for UIM coverage is immediately apparent. It means that the tortfeasor's carrier, by offering to settle for a sum somewhat less than the policy limits, can force the victim to trial solely in order to protect his UIM claim. In effect then, the victim is denied the perfectly reasonable choice of saving months, if not years, of delay, trial preparation expense, and all the ensuing wear and tear by simply accepting the offer and, as a condition of proceeding with his UIM claim, foregoing the difference between the tortfeasor's policy limit and the tortfeasor's insurer's offer. This was in fact the situation in *Schmidt*. In one of the cases there reviewed, the tortfeasor's carrier offered to settle with the victim for $22,000 out of a $25,000 liability policy. One of the questions was whether the insured could accept the offer without impairing his UIM rights. The court concluded that because the exhaustion clause in this respect was unenforceable, it could not bar the insured's right to accept the offer. It reasoned as follows:

> The purposes of the no-fault act, noted above, include those of easing the burden of litigation and encouraging prompt payment of claims.[10] Enforcement of policy exhaustion clauses would produce results contrary to those purposes. It could serve to force an insured to litigate the claim to a final judgment in order to exhaust the policy limits. Litigation expenses would lessen the insured's net recovery, the time involved in litigation would serve to delay payment to the insured, and the litigation itself would unnecessarily burden our court system. Where the best settlement available is less than the defendant's liability limits, the insured should not be forced to fore-

go settlement and go to trial in order to determine the issue of damages. The insured has the right to accept what he or she considers the best settlement available and proceed to arbitrate the underinsurance claim for a determination of whether the damages do indeed exceed the tortfeasor's liability limits. [[*Schmidt*, ]338 N.W.2d at 260–61.]

We agree completely. We agree as well with *Schmidt*'s further conclusion that *if the victim does accept less than the tortfeasor's policy limits, his recovery against his UIM carrier must nevertheless be based on a deduction of the full policy limits.*

538 A.2d at 423 (emphasis added) (some brackets added and some in original). The *Longworth* approach furthers the purpose of the UIM statute by providing the insured with a quick recovery, while at the same time protecting the statutory right of the UIM carrier to be contractually liable to indemnify its insured for his or her injuries only for the amount in excess of the tortfeasor's liability coverage.

■ We note that, in voiding exhaustion clauses in UIM policies as against public policy, we do not mean to suggest that the injured party may seek UIM benefits before resolving the bodily injury claim with the tortfeasor through settlement or judgment. UIM coverage contemplates that, "[i]f an underinsured tortfeasor is involved, . . . his [or her] victim may not pursue his [or her] contractual UIM right against his [or her] own liability insurer until he [or she] has first recovered [from] the tortfeasor[ ] . . . by settlement or judgment." *Id.* at 416. This rule acts to prevent the inconsistency that might result if insured victims were permitted simultaneously to arbitrate claims with their UIM carriers and proceed to trial with tortfeasors. Of course, while an injured insured's right to UIM benefits does not vest until he or she has concluded a settlement with or obtained a judgment from the tortfeasor, a UIM carrier remains free to tender UIM benefits at any time.

---

**10.** The legislative history of HRS § 431:10C–301(b)(4) is in accord. *See* Sen. Stand. Comm. Rep. No. 689, in 1985 Senate Journal, at 1181 (emphasizing the goal of "providing speedy and adequate protection to persons injured in motor vehicle accidents at the least possible cost").

For the same reasons that exhaustion clauses, such as the one at issue in the present case, are invalid, we hold that it is unreasonable for a UIM carrier to precondition its refusal to consent to settle upon the failure of the insured to achieve a settlement exhausting the tortfeasor's policy limits. By settling for less than policy limits, the UIM insured agrees to forego compensation for the difference between the settlement amount and the tortfeasor's liability policy limits. The UIM carrier will not be responsible for covering that "gap" as a component of its obligation to compensate its insured for injury and damage exceeding the tortfeasor's policy limits. *See Schmidt*, 338 N.W.2d at 261 (concluding that "the insured cannot obtain a below-limit settlement from the tortfeasor and then recoup the 'gap' from the underinsurance carrier"). Accordingly, there is no legitimate reason for the UIM carrier to refuse to consent to a settlement on that basis.[11]

Based on the foregoing, it is apparent that GEICO did not act reasonably in denying the Taylors' application for UIM benefits. The Taylors timely notified GEICO of their proposed settlement with State Farm. GEICO denied the Taylors' application *solely* because the Taylors did not "obtain[ ] the bodily injury policy limits of [McKaig's Bodily Injury] carrier." Thus, GEICO justified its denial solely upon an invalid exhaustion clause. The record does not indicate, nor does GEICO suggest, that GEICO's denial was premised on any investigation and consequent desire to preserve its

subrogation rights. Accordingly, we hold that GEICO's refusal to consent to the Taylors' settlement with McKaig was unreasonable and may not serve as a legitimate basis for denying the Taylors' application for UIM benefits.

## IV. CONCLUSION

For the reasons set forth above, we vacate the judgment in favor of GEICO and remand this matter to the circuit court for the entry of an order granting the Taylors' motion for summary judgment.

Concurring Opinion by NAKAYAMA, J.

While I fully agree with the reasoning of the majority regarding GEICO's liability for UIM benefits, I write separately out of concern for the message sent to the primary insurer by the result in this case. As we recently reaffirmed, " 'there is a legal duty, implied in a first- and third-party insurance contract, that the insurer must act in good faith in dealing with its insured[.]' " *Delmonte v. State Farm Fire and Cas. Co.*, 90 Hawai'i 39, 54 n. 13, 975 P.2d 1159, 1174 n. 13 (1999) (quoting *Best Place, Inc. v. Penn America Ins. Co.*, 82 Hawai'i 120, 132, 920 P.2d 334, 346 (1996)).

In the instant case, there is no allegation that State Farm acted in bad faith in making an offer of settlement less than the policy amount.[1] Nevertheless, I have a concern regarding the motivation behind offering $33,000, rather than $35,000, in light of the

---

11. In fact, we find it difficult to imagine *any* basis for a UIM carrier to refuse to consent to a settlement apart from its need to protect its subrogation interest. *See Greenvall*, 715 A.2d at 954 (recognizing that "[w]hen the insurer's subrogation rights are unaffected by the settlement, courts may not permit [consent-to-settle] clauses to defeat the claims of insureds" (citation and internal quotation signals omitted)). For example, it would not be reasonable for a UIM carrier to deny UIM benefits under a consent-to-settle provision because it believed that the plaintiff had not actually sustained damages, or because it believed that the tortfeasor was not underinsured. These are issues that may be decided by arbitration, pursuant to the provisions of the UIM policy. *See, e.g., Mulholland*, 122 Ill.Dec. 657, 527 N.E.2d at 40 (noting that an injured insured "should not be required to pursue a suit which he [or she] feels may be worthless. [An

injured insured's] policy provides for arbitration concerning the extent of [the tortfeasor's] liability and [the insured's] recovery, and [the insured] is entitled to rely on arbitration rather than pursue a costly lawsuit."); *Schmidt*, 338 N.W.2d at 261 (concluding that "[t]he insured has the right to accept what he or she considers the best settlement available and to proceed to arbitrate the underinsurance claim for a determination of whether the damages do indeed exceed the tortfeasor's liability limits"); *State Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 823–826 (Wyo. 1994) (rejecting the position "that an insured must first obtain a determination of the fault and damages caused by an uninsured motorist before filing a direct action against the insurer").

1. State Farm is not a party in this case.

extent of the stated injuries to Mrs. Taylor. The result in this case will increase the incentive to an injured party to accept a settlement offer less than the policy limits of the primary insurance. The injured party may then pursue his or her UIM claim without the expense and delay of litigation. However, primary insurers should not take this as carte blanche to offer lower settlements without good faith justification. We are mindful, as all insurers must also be, that the principles of good faith and fair dealing continue to apply.